# Alabama Gold Life Insurance Company *v.* Lott, Tax Collector.

*Bill in Equity to restrain Collection of Taxes.*

1.  *Taxation ; what deducted from credits subject to.*—Under a statute subjecting to taxation "all money loaned and solvent credits," and providing that the indebtedness of the tax-payer shall be deducted from such credits, and the excess only taxed, a life insurance company is entitled to deduct the amount of its "premium reserve" from the solvent credits which it is required to return for taxation.

2.  *Same.*—The amount due the insurance company on "deferred premiums," "loan premium notes," and "renewal premiums," or other similar credits for which the policy stands as security, together with all the available assets of the company, (except State bonds, the amount invested in real estate and taxed as such, capital paid in and taxed as "paid up capital," other assets otherwise taxed, and real property not in this State,) must be set off against the "reserve fund" and other indebtedness of the company, and the excess of such credits over the indebtedness of the company, is the sum to be assessed as solvent credits, subject to taxation.

3.  *Same ; what proper subject of taxation.*—In the absence of plain constitutional restrictions, it rests within the wisdom of the Legislature to determine the subjects of taxation, and there is nothing in our Constitution which forbids the taxation of credits secured by mortgage on property which is also taxed.

4.  *Injunction to stay collection of taxes ; when improper.*—A court of equity will not enjoin the collection of State and county taxes, unless, in addition to illegality, hardship, or irregularity, the case be brought within some of the recognized heads of equity jurisdiction, and will not interfere in any case merely because of errors of excess in valuation, or hardship, or injustice of

the law, or any grievance which can be redressed by suit at law, either before or after the payment of taxes.

5. *Same; offer to do equity.*—In cases where an injunction may be proper to stay the collection of excessive taxes, the complainant must pay or tender the amount really due, and in default of such tender or payment the bill should not be entertained.

APPEAL from Chancery Court of Mobile.

Heard before Hon. H. AUSTILL.

This was a bill in equity filed by the appellant, The Alabama Gold Life Insurance Company, a domestic corporation carrying on the business of life insurance, against the appellee, Lott, tax collector, to enjoin the collection of certain taxes. The chancellor dismissed the bill on demurrer, and this decree is now assigned, among other things, for error.

BOYLES & OVERALL, for appellant.

C. W. RAPIER, *contra*.

MANNING, J.—Appellant in this cause filed a bill for an injunction to restrain appellee, tax collector of Mobile county, from collecting certain State and county taxes, assessed against it for money lent and solvent credits for the years 1871, 1872 and 1873, and alleging that it had "paid the tax on its capital stock and real estate, and all other taxes which said company is legally liable to pay to said State and county for each of said years."

The assessments complained of are alleged to have been made by the assessor in the latter part of the year 1873 " as for escaped subjects of taxation " of said years, and to consist of charges for money lent and solvent credits of the company to the amount of $200,000 00 for the year 1871, with a tax thereon of one 5-100 dollar per $100, and of $274,500 for the year 1872, with a tax thereon of one 15-100 dollar per $100, and of $300,000 for the year 1873, and a tax thereon of one 40-100 dollar per $100, which taxes, amounting together to the sum of $9,461 25-100. The bill alleges the defendant, Lott, as tax collector, is proceeding to collect the tax by levy on the office furniture of complainant, necessary to the carrying on of its business, whereby, if defendant be not restrained, complainant will suffer irreparable loss. It is further alleged that this furniture is not of sufficient value to pay said taxes, for which reason seizures will be made of other personal property by the sheriff, which will make necessary a multiplicity of suits for trespass against him, and that complainant apprehends a levy will be made upon its real estate also, which, with the consequent sale, will create a cloud on the title, wherefore an injunction is prayed. The

bill also sets forth that "orator declined to render an account of money loaned and solvent credits to said assessor for taxation, on the ground that after deducting from the company's assets its non-taxable property and its indebtedness, as shown by exhibits, there was no excess left for the purposes of taxation, and that your orator then and now contends it had a right to do. The exhibits were made out several months ago, and were submitted to and made known to said assessor and collector, yet they still insist on claiming from your orator said large sum of money, and the said collector has levied," &c. The bill making these averments was sworn to, and the injunction granted June 19th, 1874.

The exhibits are statements of the assets and liabilities of the company for the years 1871, 1872 and 1873 respectively. Taking, for example, the last, it shows assets to the amount of $753,581 33-100, and liabilities to the amount of $753,-906 05-100. Deducting from the former the amount of stockholders' notes for capital not paid in, (which is not taxable under the revenue act,) and from the liabilities, the capital stock subscribed, put down at $200,000, as not proper to be included in the statement for the purposes of this suit, and we have assets exceeding $600,000, and liabilities less than $470,000 in amounts.

From the items composing these sums, complainant's counsel make statements as follows of what they contend are non-taxable assets, and of what they admit to be taxable assets, and then of what they insist is the indebtedness of the company, which (they maintain) should be set off against the taxable assets only. And thus they argue, that as the indebtedness exceeds the amount of taxable solvent credits by over $222,000, there is no excess of money lent and solvent credits liable to taxation under the clause of the act of 1868, which subjects thereto "all money loaned and solvent credits, from which credits the indebtedness of the tax-payer shall be deducted and the excess only shall be taxed."—Revenue Act of 1868, section 6, clause 20.

### NON-TAXABLE ASSETS FOR 1873.

| | | |
|---|---:|---:|
| Bonds of the State of Alabama | $ 18,462 | 50 |
| Deferred Premium Notes | 13,406 | 11 |
| Loan Premium Notes | 78,900 | 83 |
| New Premiums | 75,338 | 55 |
| Renewal Premiums | 69,008 | 32 |
| Cash deposited in Mississippi | 7,847 | 53 |
| Cash on hand | 31,147 | 96 |
| Due on Capital Stock | 9,310 | 00 |
| Capital Stock invested in Real Estate | 26,368 | 46 |
| | $330,060 | 26 |

[Alabama Gold Life Insurance Company v. Lott, Tax Collector.]

"TAXABLE ASSETS FOR 1873.

| | |
|---|---|
| Money Loaned on Mortgage | $124,101 05 |
| Otherwise secured | 108,316 14 |
| Due from other Insurance Companies | 4,500 00 |
| Open accounts unpaid | 4,074 41 |
| Interest due the Company | 4,630 69 |
| Rents due the Company | 480 00 |
| | $247,102 74 |

"INDEBTEDNESS OF THE COMPANY FOR 1873.

| | |
|---|---|
| Due Banks and Bankers | $ 19,000 00 |
| Agents on account | 26,562 90 |
| Other parties | 238 24 |
| Death losses unpaid | 35,239 91 |
| Premium Reserve | 338,965 00 |
| | $469,904 05 |

Excess of indebtedness over taxable solvent credits for 1873 ... $222,801 31"

Admitting that the bonds of this State owned by the company, and the capital stock invested in real estate (which is taxed as such), and other things in the first foregoing statement are not taxable, it does not follow that the indebtedness in such a case as this is to be set off only against the items admitted to be taxable assets in the statement above. In getting to a correct conclusion respecting this whole matter, we must consider what is meant by the "premium reserve," mentioned in the above exhibit, and therein set down at $388,965, and also by some of the items set forth as "nontaxable assets."

The bill sets forth that the business of the company is life insurance; that in order to secure the holders of policies issued by it, the money received from them for premiums from year to year, over and above its actual expenses, is invested in bonds, promissory notes, loans and mortgages on real and personal property, drawing interest. These solvent credits are called a 'reserved fund;' held by said company to pay losses accruing from deaths of its policy holders." If this is intended to be a full summary of the methods of investment used by the company; it appears to be incomplete, in not mentioning that the premiums are invested in "loan premium notes" also, and other credits. And if by

" reserved fund," as above explained, is meant what is called in the above tables of indebtedness, "premium reserve," the explanation is somewhat inaccurate. This latter we understand to represent the present indebtment of the company by its policies at any time, and therefore the corresponding fund which, besides its other assets, it ought to have in reserve, to meet that indebtment.

To contract obligations that shall be discharged in money, payable upon the happening of the death of those whose lives are insured or other designated future events, in consideration of premiums to be in the mean time periodically paid to the companies, is the proper and especial business of life insurance associations. Their success and prosperity, when honestly and prudently managed, are measured by the number and amount of such obligations created by the policies they issue. To be indebted is, therefore, their normal condition, a condition necessary to their healthful vitality, while their actual wealth at any time consists only of the surplus of their assets (composed almost entirely of credits), over and above their indebtment at the same time.

Of course, the indebtment of such a company is not identical with the aggregate of all the sums for which its policies are issued. For, while these are running to maturity, they bring into the company a stream of the premiums in consideration of which they were issued, and which being added to those that have previously flowed in, constitute the supply out of which the company discharges the frequent demands arising out of the expiring policies, and the dividends that may be due to stockholders, as well as its current expenses. This supply should always exceed the amount of estimated present indebtment at any time, the proper provision for which is supposed to be the fund known as "the premium reserve," which, however, may be embraced in and be a part of the general assets of the company.

The amount of this fund depends upon the amount of the policies outstanding, payable in the future, generally soon after the death of persons on whose lives they are given, and is determined by men skilled as actuaries, who ascertain, according to certain rules or methods of computation, what is at any time the present value of all such outstanding policies, or, (what is equivalent thereto,) the sum that is required to safely reinsure them. And this sum or value, representing what all the policies are worth at the particular time, or what other insurance companies would charge for taking the same risks, is the measure of the company's indebtedness at that time to its policy holders, and is habitually set down in the annual or other periodical statements

required in many of the States by law to be made of the assets and liabilities of life insurance companies, as an item, and the principal item of present indebtedness.   The amount of the liabilities upon all the outstanding policies, is of course many times greater.   And by an unusual mortality in a particular year, the losses of a company might amount, and its indebtedness be increased to a larger sum than its estimated "reserved fund."   But this fund is doubtless generally adequate, and the method of ascertaining it is probably as accurate as any that can be devised under the direction of a court, or be used by a company desirous to do right, of determining the amount of its present indebtedness at any particular time.

And we may remark that it is much easier to estimate the present value in gross of the policies on a large number of lives, in which an average may be proximately obtained, than to compute such value of each of numerous outstanding policies singly, according to the ages and state of health of the persons on whose lives they are respectively issued, in order to determine how much shall be paid to the several holders of them out of the funds of a life insurance company that has failed and is in course of settlement.   These latter were the problems to be solved in *In re English Assurance Company, Holditch's case*, Law. Rep. 14, Eq. 72, and other cases in the English courts; see 3 Bigelow's Life and Acc. Ins. Co., Rep. 272.

A life insurance company, therefore, when its solvent credits are assessed for taxation, under a statute which declares that from them "the indebtedness of the tax payer shall be deducted, and that the excess only shall be taxed," ought to be allowed to have deducted them from its "premium reserve."   Unless this be done, an invidious discrimination will be made against institutions which it cannot be supposed the legislature intended to tax out of existence.

But it cannot be admitted that this fund shall be set off only against that part of the property and assets which the counsel for appellant represent as all that is taxable, or that their statement correctly sets forth what things are taxable and what not.   For it will be apparent from what we shall presently say about the manner in which the deferred premium notes and other like credits are secured, that they must be regarded as "solvent credits" under the revenue act quite as legitimately as bonds and mortgages.

The assets consist chiefly of premiums invested in State bonds, in promissory notes secured by the company's policies on the lives insured, in the notes called "loan premium notes," "deferred premiums," and "renewal premiums," &c.,

as well as in bonds secured by mortgages, and the payment of them is as effectually secured by the policies as they would be by mortgages. If they were not, the money they represent would not be put at hazard on such securities. And while the fund thus invested is allowed to the company as an indebtedness to be deducted, the amount of it, as an accurate representation of the present value of all the outstanding policies, varies as the sum total of these is increased or diminished by additions or forfeitures of the policies, or otherwise. And if any of the "deferred premium notes," or other similar credits, for which the policies stand as sufficient securities, are not paid, the company is a gainer thereby, since there is a corresponding larger reduction of its indebtedness by the consequent forfeiture of policies.

Our conclusion is, therefore, that the sums due by credits of the class specified, and in fact all the available assets, except the State bonds and the sum invested in real estate taxed as such, and the other capital paid in, which is taxed as paid up capital, and other assets that are otherwise taxed, and except, also, real property not in Alabama, must be set off against the reserve fund, which is invested therein, and the other indebtedness of the company; and that the excess of those credits over the indebtedness is the sum to be assessed as "solvent credits," subject to taxation.

We have not overlooked the argument of counsel for appellant, that the credits of the company secured by a mortgage on lands that are taxed, are not themselves taxable, because this would be duplicate taxation, and we have examined the interesting case to that effect, referred to us in support of the argument, in which the supreme court of California held that such taxation was prohibited by the constitution of that State. But why do counsel restrict the proposition to credits secured by mortgages of property? If a credit not so secured might properly be taxed, the fact that there is a mortgage to support it does not render it less fit to be taxed. It would seem that it should be more so, because the value of it is thereby made more definite and stable, while in either case the debt must be paid out of the taxed property of the debtor. The reasoning on the subject and the case cited also, go, as they logically must, to the extent of maintaining that taxes should not be imposed at all on a mere credit, a *chose in action*, a thing in right but not in actual possession, because such credit must be paid in money, or some other tangible property which is taxed.

It may be, that by some subtle process, all the taxes that are charged against the lender of money, or seller of property, for the amount which the borrowers or purchasers owe

him therefor, as "solvent credits," get back and fasten themselves upon their property; and, it may perhaps be true, that the highest public interests would be promoted (as has been very ably contended,) by assessing all taxes upon the real estate of a country.   There is something striking in the illustrations used to show that to tax credits, is a false and oppressive policy.   For instance, the advocates of such views say : "Suppose—what would be possible in theory—that the necessities of government required a tax of 100 per centum on all values, or, what would be the result of such a tax, an appropriation of all the property in the State—it is plain that the State would receive no benefit from evidences of debt due by some of her citizens to others, and payable out of the tangible property which the State had already taken." Admit this to be so—yet, so long as such a state of things is only "possible in theory"—and the tangible property of the country is actually distributed among the people, and one man is indebted to another among them, and so long as incomes (generally equally as large if not larger) are received by the creditor class from their credits, as well as by the property-holders from their property, it will not be possible to convince the latter, even (perhaps we should say especially) the debtors of that class, that it would be either just or expedient to tax the property from which their incomes are drawn, and not the credits from which the incomes of the creditors are derived.   It should be remembered that taxes being regarded as the contributions of the people for the support of the State, must be assessed on such subjects of taxation as the people, by their representatives, choose to designate; and they have chosen during the whole period of our history, to say that credits, or the moneys that the creditor class have out upon interest, shall be subject to taxation as well as the tangible property which, by the employment of labor and skill, is made to return valuable products for its owners.   Moreover, in the opinion of a vast majority of the people, such an adjustment of the burdens of supporting government, would be regarded as justified more clearly than the other suggested, by one of the accepted maxims of policy laid down by the celebrated author of "Wealth of Nations," to-wit: "That the subjects of every State ought to contribute to the support of government as nearly as possible, *in proportion to the revenue which they respectively enjoy under its protection.*"—Cooley on Taxation, p. 6.

We are not undertaking to support or controvert any theory in political economy.   The point made in argument by counsel for appellant, is that the taxation of credits secured by mortgages of property, is illegal and void.   In support of

the argument they cite a case in which the supreme court of California hold, that such a revenue act, violates the provision in the constitution of that State, that "taxation shall be equal and uniform throughout the State, and all property in the State shall be taxed in proportion to its value." Our object is only to show why we can not put a like interpretation on the similar clause in our constitution, declaring that "all taxes levied on property in this State shall be assessed in exact proportion to the value of such property." We think this was not understood by the convention, or the people, in that sense. And we adopt the observations of Judge Cooley, made in reference to the case above cited, (in his treatise on taxation, p. 160): "It can not be too distinctly borne in mind, that any possible system of tax legislation, must inevitably produce unequal and unjust results in individual instances; and if inequality in result must defeat the general law, then taxation becomes impossible and governments must fall back upon arbitrary exactions. But no such impracticable principle is recognized in revenue laws. While equality and justice are constantly to be aimed at, impossibilities are not demanded. Tax legislation must be practical." And we may add, it must seem to the great body of the people to be just, or it can not be stable.

The appellee insists, that independently of the merits or demerits of defendant's case, the decree of the chancellor dismissing the bill should be affirmed, for the reason that it is a cause to restrain the collection of taxes, which a court of equity ought not to maintain. Such suits are not regarded with favor. A chief reason for this is of a public and political nature.

"It is upon taxation that the States chiefly rely to obtain the means to carry on their respective governments; and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied, should be interfered with as little as possible. Any delay in the proceedings of the officers, on whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public."—*Dow v. Chicago*, 11 Wall. 108.

"How could a government calculate with any certainty upon the revenues, if the collection of the taxes was subject to be arrested in every instance in which a tax payer or tax collector could make out, *prima facie*, a technical case for arresting such collection?"—*Eve v. State*, 21 Ga. 50; Cooley on Taxation, 587.

The supreme court of the United States have several times expressed its opinion on this subject. The latest occasion

for doing so, was afforded during the term of that court lately adjourned, in the Illinois railroad tax cases, (*Taylor et al v. Secor et al.*, and others,) in which the companies concerned sought to restrain officers of Illinois from what was deemed the oppressive taxation of that State. The opinion delivered by Mr. Justice MILLER is reported in the Central Law Journal, of St. Louis, of the 26th of last May.

In it, among other things, he says: "It has been repeatedly decided that neither the mere illegality of the tax complained of, nor its injustice, nor irregularity of themselves, give the right to an injunction in a court of equity."—(Several cases are here cited.) . . . . . .

. . "That there might be no misunderstanding of the universality of this principle, it was expressly enacted in 1867, that 'no suit for the purpose of restraining the assessment or collection of any tax shall be restrained in any court.' Revised Statutes, § 3224. And though this was intended to apply alone to taxes levied by the United States, it shows the sense of congress of the evils to be feared, if courts of justice could, in *any case*, interfere with the process of collecting the taxes, on which the government depends for its continued existence. It is a wise policy. It is founded in the simple philosophy—derived from the experience of ages— that the payment of taxes has to be enforced by summary and stringent means, against a reluctant and often adverse sentiment; and to do this successfully, other instrumentalities and other modes of procedure are necessary, than those which belong to courts of justice."

This may be too strong a declaration against the interference, in any case, of the courts, or even of a court of equity by injunction, with the collection of taxes. And the enactment referred to (a similar one to which exists in Georgia) savors somewhat of arbitrary restraint, upon the exercise of a judicial function which might some times be well exerted to protect the citizen from official oppression and fraud. But even when no statute prohibits this from being done, a chancellor ought not to interfere, unless the complainant show he is manifestly entitled to its aid. We adopt the views on this subject, expressed by Justice MILLER in the same opinion, as follows: "We do not propose to lay down any absolute limitation of the powers of a court of equity, in restraining the collection of illegal taxes. But we may say that in addition to illegality, hardship, or irregularity, the case must be brought within some of the recognized foundations of equitable jurisdiction, and that mere errors of excess in valuation, or hardship or injustice of the law, or any grievance which can be redressed by a suit at law, either before or after the

payment of taxes, will not justify a court of equity to interpose by injunction to stay collection of a tax.

"One of the reasons why a court should not thus interfere, as it would in any transaction between individuals, is, that it has no power to apportion the tax, or to make a new assessment, or to direct another to be made, by the proper officers of the State. These officers, and the manner in which they shall exercise their functions, are wholly beyond the power of the court when so acting. The levy of taxes is not a judicial function. Its exercise by the constitution of all the States, and by the theory of our English origin, is exclusively legislative."—*Heine v. Levee Com'rs*, 19 Wall. 660.

"A court of equity is, therefore, hampered in the exercise of its jurisdiction by the necessity of enjoining the tax complained of, in whole or in part, without any power of doing complete justice, by making or causing to be made a new assessment on any principle it may decide to be the right one. In this manner it may, by enjoining the levy, enable the complainant to escape wholly the tax, for the period of time complained of, though it be obvious he ought to pay a tax, if imposed in the proper manner."

Hence, another rule must be observed, when cases of the kind under consideration, that have merits to commend them, are brought into court. Before complainants seek the aid of the court to be relieved of excessive taxation, they should pay what is due.

"The State is not to be tied up, as to that of which there is no contest, by lumping it with that which is really contested. If the proper officer refuses to receive a part of the tax, it must be tendered, and tendered without the condition annexed, of a receipt in full for all the taxes assessed."

According to the principles embraced in the passages quoted above, complainant did not make out a proper case for the interposition of a court of equity. The averments of irreparable mischief, multiplicity of suits and cloud upon the title, though ingeniously framed, could be equally well made in any suit of the kind. All the difficulties here suggested, might have been avoided by paying the tax under protest; after which the money, if illegally exacted, could have been recovered back by an action at law, without any serious injury, so far as the bill discloses being inflicted on the company.

It further appears that some amount of taxes was due from complainant, which it had not paid or offered to pay. The averment that it "had paid the tax on its capital stock and real estate, and *all other taxes which said company is legally liable to pay*," is, at the close of it, an averment of a legal

[Ferguson, pro ami, v. Lowery et al.]

conclusion only and not of facts. It ought to have set forth a statement of particulars, which would enable the court to see whether the legal conclusion was correct according to the facts.

There was also a failure of duty on the part of complainant (as taking the bill most strongly against it, we infer,) in declining to render any statement when demanded, or in due time, of, its solvent credits.

Whether the fact that the assessment was for "escaped subjects of taxation of former years, would make this delinquency a less serious matter than it otherwise might be, we need not stop to inquire. The views we have before expressed will probably enable the parties to come to a just settlement.

The decree of the chancellor must be affirmed.