# Moog *v.* Randolph.

*Mandamus to Probate Judge, refusing to grant License for Retailing Spirituous Liquors.*

1. *Judicial notice of legislative journals.*—The courts take judicial notice of the journals kept by the two houses of the General Assembly, and are authorized to search them for the purpose of ascertaining whether a particular statute, included in the printed volume published by authority, was enacted in accordance with the forms prescribed by constitutional provisions.

2. *Variance between approved (or enrolled) and original bill.*—A material variance, in substance and legal effect, between the enrolled bill which was signed by the governor, and the bill which actually passed the General Assembly, as shown by the journals of the two houses, is fatal to the validity of the enactment as a law.

3. *Same; Revenue Law of Feb. 23d, 1883.*—The revenue law approved February 23d, 1883, as signed by the governor, imposed a tax on "all money loaned and solvent credits, or credits of value" (Sess. Acts 1882-3, p. 71, § 5, subd. 7), without any deduction of the tax-payer's indebtedness, while the bill which actually passed the two houses of the General Assembly, as shown by their journals, contained a clause expressly authorizing such deduction, and taxing the surplus only; and this variance destroys the validity of the entire enactment. (STONE, J., doubting.)

4. *General Assembly; length of session under constitutional provisions.* The constitutional provision limiting the sessions of the General Assembly to fifty days (Art. IV, § 5) has been construed by successive legislatures to mean fifty legislative working days, excluding Sundays and other days on which, by concurrent resolution, the two houses do not sit; and the court adopts this construction.

APPEAL from the City Court of Montgomery.

Tried before the Hon. THOS. M. ARRINGTON.

This cause originated in an application by A. Moog, to Hon. F. C. RANDOLPH, judge of the Probate Court of Montgomery county, for a license to retail spirituous liquors within the corporate limits of the city of Montgomery, for and during the year 1883, on the payment of $125 as the price of the license. The probate judge refused to grant the license, except on the payment of $200, the price of a license as prescribed by the

provisions of the law approved February 23d, 1883.—Sess. Acts 1882–3, p. 76, § 14. Thereupon, the petitioner applied to the judge of the City Court, for a *mandamus* to the probate judge, requiring him to grant a license as prayed; and on the hearing in that court, the following facts were agreed on, "as a statement of the facts upon which the case is to be decided."

(1.) " That defendant refused to issue the license prayed for, under the authority of the act of the General Assembly approved February 23d, 1883, entitled ' An act to levy taxes for the use of the State and the counties thereof,' which appears in the printed publication of the laws of 1882–3 ; and because by the provisions of that act (section 14, subdivision 3), the price of a license for retailing spirituous liquors, in cities and towns containing over 5,000 inhabitants, is made $200 for the State, while the petitioner tendered only $125, the price of a license under the Code of 1876." (2.) " That the city of Montgomery, in which the petitioner proposed to do business, contains over 5,000 inhabitants ; and, under the charter of said city, all persons doing the business in the city, for which the petitioner applied, are exempt from the payment of any license to the county." (3.) " That the said act of February 23d, 1883, above referred to, as appearing in the printed publication of the laws of 1882–3, in all things agrees with, and conforms to the act which passed both houses of the General Assembly, and was approved by the governor, except that the journals of the two houses show that there was a disagreement between the two houses on an amendment to the 7th subdivision of the 5th section of said act ; that a conference committee was appointed, and agreed upon a report amending said subdivision by inserting after the word '*values*,' where it appears in the printed copy, these words : '*from which credits the indebtedness of the tax-payer shall be deducted, and the excess only shall be taxed ; but persons engaged in the business of borrowing and lending money shall not be allowed such deduction.*' Such report was made to each house, and was agreed upon and adopted by them ; but, in enrolling said bill, by mistake of the enrolling clerk, the words above set out were omitted from the enrolled bill, and said bill, without these words, was signed by the presiding officers of the two houses, and approved by the governor." (4.) " That the General Assembly met on the 14th day of November, 1882, and remained in session until the 12th day of December, 1882, when they took a recess until the 24th day of January, 1883, and adjourned *sine die* on the 23d February, 1883 ; and during said periods they held no session on any Sunday, nor on any Thanksgiving day, as proclaimed by the president and governor, nor on the 22d day of February, 1883, but regularly adjourned over each of these days, as shown by the journals of the two houses."

[Moog v. Randolph.]

On these facts, as admitted and agreed on, the City Court refused a *mandamus*, and dismissed the petition ; and its judgment was assigned as error in this court.

The case was decided on the 12th April, 1883 ; but the opinion delivered by BRICKELL, C. J., was withdrawn by him, and the reporter has never been able to obtain a copy of it. The case is now published by order of the court.

SEMPLE & SON, for appellant.

H. C. TOMPKINS, Attorney-General, and P. HAMILTON, *contra*.

SOMERVILLE, J.—Since the decision of this court in the case of *Jones v. Hutchinson*, 43 Ala. 721, which was made at the June term, 1868, it may be regarded as a settled principle of law in this State, that the courts are authorized to search the records of the General Assembly, of which they are required to take judicial notice, so as to ascertain and declare whether a printed statute, purporting to be published under authority of the State, has, in truth and fact, been enacted according to the forms prescribed by the constitution. And, inasmuch as a *bill*, under the mandatory provisions of this instrument, can become a *law*, only when it has gone through all the forms made necessary to give it validity and force as such, the courts will pronounce it *a law*, or *not a law*, according as the legislative records may disclose a compliance, or failure of compliance, with these constitutional requirements.

I take it furthermore as a sound rule, also settled by our decisions, that if the bill which is *passed* by the General Assembly *varies materially, in substance and legal effect*, from that which is *approved* by the Governor—especially where this subject of variance involves a matter of amendment, without the incorporation of which in the bill one of the houses refused to concur with the other in its final passage—then there exists such a want of legal and actual identity between the bill passed and the one approved, as that *neither* of them acquires the force of a valid and constitutional enactment. In such a case, the bill passed by the General Assembly is not the one approved by the Governor, and the one approved by the Governor is, *e converso*, not the one passed by the General Assembly. The courts would be assuming too much, to presume that the same reasons which induced the one house to refuse to concur with the other, except on the condition of incorporating its amendment, might not likewise operate to induce the Governor to withhold his approval of the entire measure, without which it must have failed to become a law.—*Jones v. Hutchinson*, 43 Ala. 721 ; *Moody v. The State*, 48 Ala. 115.

[Moog v. Randolph.]

The question presented for our determination is, the influence which the application of this principle must exert upon the validity of an enactment of the late General Assembly, entitled "An act to levy taxes for the use of this State, and the counties thereof," approved February 23, 1883, and found on pages 67 to 83, inclusive, of the published Acts of that body, passed at the session of 1882–83. This enactment was approved by the Governor in the form in which it has been published, and in the exact form also in which it was *enrolled.* But it is materially variant, in substance and legal effect, from the bill which is shown to have been passed by the two houses of the General Assembly. The House Journal shows, that the enrolling-clerk omitted to incorporate in the enrolled 'bill, no doubt inadvertently, a material *amendment,* which was a component part of the complete bill as it passed these two legislative bodies. That this omission vitiates the entire bill, I think, there can be no room for doubt; provided the amendment itself, which is omitted, is not void for repugnancy to the constitution, on grounds which I shall hereafter discuss.

Let us suppose, for illustration, that the bill in its complete form, as it passed the two houses, had been signed by the presiding officers of these respective bodies, and had been presented to the Governor for his approval, and he had drawn his pen through this same amendment, and, after thus expunging it, had *approved the residue* of the measure, this being done as a condition precedent to affixing his signature. Would there not exist, in such a case, precisely the same difference in fact between the bill passed and that approved, as is here presented? The part *expunged* in the one case, and the part *omitted* in the other, being identical, the identity of the remainder is axiomatic. Could any one seriously contend, that the approval of a part of a measure, however honestly done in the conviction of its propriety, would operate to give any legal force to the part thus approved? And yet, where is the difference, in practical effect, between the two cases? The clear logic of the case lies in the axiom, that a bill is *an entirety,* and a law is the product of the combined, harmonious and unanimous action of the legislative and executive departments of government, each acting strictly within the scope of its constitutional authority, and according to the prescribed forms of the constitutional mandate. When, therefore, as we have said, the measure assented to by one of these departments is not, in substance and legal effect, the measure assented to by the other, but differs from it materially in its operation as a law, it is in no proper sense a constitutional or valid enactment.

In this case, we are not left to any mere conjecture as to the *materiality* of this difference between the two measures. The

journals of the two houses show that the omitted amendment was a point of contention between these two bodies, and that the Senate refused to pass the bill as it came from the House, without amendment, in the acceptance of which the House concurred only after a modification of it, and through the conciliatory influence of a conference committee composed of members representing respectively the two dissenting bodies. After all, it must be remembered, the matter presented a mere legislative election between a new law, proposed to be enacted, as to the wisdom and policy of which the two houses were not in harmony, and an old one already on the statute-books for seven years past, which, with few changes, had met with the previous approbation of three successive General Assemblies.

The amendment under consideration was proposed and adopted as a part of subdivision 7 of section 5, as found on page 71 of the published Acts. We append this subdivision, and include in it the omitted amendment, designated by *italics*, for a more ready discrimination of its connection and bearing:

" 7. All moneyed capital, that is, all money loaned and solvent credits or credits of value, *from which credits the indebtedness of the tax-payer shall be deducted, and the excess only shall be taxed; but persons engaged in the business of borrowing and lending money shall not be allowed such deduction,* and all money employed in the business of advancing or loaning on stocks, bonds, bullion, bills of exchange, or promissory notes, or in the purchase thereof, or in the discount of bills of exchange, &c., except when the money so employed is otherwise taxed as capital."—Acts 1882-83, p. 71.

It is insisted by the appellee's counsel, in support of the validity of the entire enactment, as published, that the *omission of the amendment from the enrolled bill was immaterial,* because, if inserted, it must have been pronounced unconstitutional and void—and for this reason, the bill as approved was *identical in legal effect* with the one that was passed by the General Assembly. Conceding the soundness of the latter proposition, in which I am disposed to concur, the question is presented as to whether this amendment is violative of any provision of our constitution, bearing on the subject of taxation. These constitutional clauses are as follows:

" All taxes levied on property in this State, shall be assessed in exact proportion to the value of the property."—Article IX, section 1; Constitution, 1875.

" The property of private corporations, associations and individuals in this State, shall forever be taxed at the same rate"— the only exception being institutions or enterprises devoted exclusively to religious, educational, or charitable purposes.—Art. IX, section 6, Constitution, 1875.

[Moog v. Randolph.]

It is settled that the general purpose of these clauses is to establish an *ad-valorem* system of taxation, thus exacting a certain kind of uniformity in the rules of taxation, as applied to the property of all persons, whether private or artificial, Sections similar in phraseology and signification, are found in the constitutions of some of our sister States. Their object has been construed to be, to secure, as far as practicable, that equality in bearing the just burdens of government, which has become a distinguishing characteristic of the American States, and has been well denominated the corner-stone of Anglo-Saxon liberty. These clauses have never been construed to exact the taxation of all property, of every description, in the State, at precisely the same rate of taxation, without regard to its peculiar nature, uses, or other characteristics. Nor can they any more be interpreted to prohibit exemptions from taxation, or such *classifications of property*, as are not purely arbitrary, capricious, or without the semblance of reason.—*Clark & Murrell v. Port of Mobile*, 67 Ala. 217; *Mayor of Mobile v. Stonewall Ins. Co.*, 53 Ala. 570; Cooley's Const. Lim. 515; Burroughs on Tax. pp. 65-69, sections 53, 54. As observed by Judge Cooley, "It is difficult to conceive of an exemption law which selects single individuals or corporations, or single articles of property, and, taking them out of the class to which they belong, makes them the subject of capricious legislative favor. Such favoritism could make no pretense to equality; it would lack the semblance of legitimate tax legislation." Cooley on Tax. 153, 183; *Howell v. Bristol*, 8 Bush, 493.

There is a clear line of demarcation between the *taxing power* of a government, and the *right of eminent domain*, which is not properly distinguished in many of the adjudged cases, thus sometimes tending to confusion. Taxation is the just proportion of the citizen's share or contribution to the support of the government, while eminent domain involves the idea of a forced contribution, beyond, or in excess of his share.—Burroughs on Tax., sec. 6; *People v. Mayor of Brooklyn*, 4 N. Y. 424. The legitimate taxing power is not at all abridged by the constitutional restriction, providing that private property shall not be taken for public use without just compensation; this limitation being generally construed to have reference strictly only to the power of eminent domain.—Pomeroy on Const. Law, 160, sec. 251. Yet it is manifest that the confiscation of the citizen's property can not be legalized by calling it taxation, and that taxation ceases to be such when it becomes spoliation. The legislature would have no power, under the device of a *classification*, to tax the property of all Jews or Israelites, at a rate greater than that of other citizens; nor to say that others should be exempt from paying taxes because of

[Moog v. Randolph.]

their peculiar religious tenets, or of the color of their hair. Such legislation would constitute shameless infractions of that familiar maxim, which Lord Coke declared to be the pride of the English law—*Lex uno ore omnes alloquitur.*—2 Inst. 184.

These principles are announced, in order that we may not be misunderstood. The paramount difficulty is, as to *when* the courts can properly interpose to declare a statute void, because of its taxing a particular class of property, upon a principle which seems to violate the rule of relative uniformity designed by the constitution. "It is only when statutes are passed," says BIGE-LOW, C. J., in *Com. v. Savings Bank*, 5 Allen, 436, "which impose taxes on false and unjust principles, or operate to produce gross inequality, so that they can not be deemed, in any just sense, proportional in their effect on those who are to bear the public charges, that courts can interpose, and arrest the course of legislation by declaring such enactments void."

This proposition, in my opinion, is correct, in a modified sense; but there can be no excuse for the interference of the courts, unless this inequality—whether manifest by a system of exemptions or classifications—is *not only oppressive in its operation, but is so glaring as that it can be judicially declared to be founded on arbitrary and capricious principles, without the just semblance of reason.* In such a case, the system would cease to be taxation, and become governmental spoliation; thus trespassing on the boundary line of eminent domain, which is a right that can not be exercised under the provisions of our constitution, without first paying to the citizen a just compensation for his property taken by the State.—*New Orleans & Selma R. R. Co. v. Jones*, 68 Ala. 48. No law can be upheld, which carries on its face the patent fact that its intention was confiscation under the guise of taxation.—Cooley on Tax. 128. Where the precise line of distinction exists, is often a question of great complexity, and of difficult solution. Neither any fixed rule of reason, nor the authorities furnish us any definite or clearly defined principle upon which to settle an accurate rule for all cases.—*S. & N. Railroad Co. v. Morris*, 65 Ala. 193; *State v. Indianapolis*, 69 Ind. 375 (s. c., 35 Amer. Rep. 223); *Knowlton v. Supervisors*, 9 Wisc. 410; Burroughs on Tax. p. 32, sec. 34; *Wells v. City of Weston*, 22 Mo. 385; *State v. Fosdick*, 21 La. Ann. 434; *In matter of Town Flatbush*, 60 N. Y. 398; *State v. Ogden*, 10 La. 402.

Subject to the above limitation, I do not see how the courts can circumscribe the legislative power to select the proper subjects of taxation, and to classify them upon principles which to them seem just. There must, of necessity, be left a liberal scope for the free exercise of this presumably wise discretion. It is said by Judge Cooley, in his work on Constitutional

Limitations: "The constitutional requirement of equality and uniformity only extends to such subjects of taxation as the legislature shall determine to be properly subject to the burden. *The power to determine the persons and the objects* to be taxed, is trusted exclusively to the *legislative department*; but over all these objects the burden must be spread, or it will be unequal and unlawful as to such as are selected to make the payment."—Cooley Const. Lim., 5th Ed., p. 638 (515). There no doubt may be cases, where the regulation as to assessments would be so unequal, as to be obnoxious to the constitutional rule of uniformity.—*Pollard v. The State*, 65 Ala. 628. But all that can be required is such regulation as shall secure a fair and just valuation.—*Louisville R. R. Co. v. The State*, 25 Ind. 177.

I am quite free to admit that the question under consideration is involved in both difficulty and doubt. For the purposes of this discussion it may be conceded, without in any wise affecting this question, that the last clause of the amendment—providing that "*persons engaged in the business of borrowing and lending money shall not be allowed such deductions*"—is objectionable on constitutional grounds—a point that we need not decide—and yet the remainder of the amendment would not necessarily fall, but might stand unaffected by the vitiated part; and the question would still recur, *Can the General Assembly constitutionally authorize the indebtedness of the taxpayer to be deducted from his solvent credits, or credits of value*, which they have made a new and proper subject of taxation.

The purpose and effect of the law, it may be argued with much force, is not so much to tax the credits themselves specifically and *eo nomine*, as the *surplus* of the credits over and above the tax-payer's indebtedness; or, in other words, the difference between the debts due *to* and *from* the tax-payer, which is made by the sovereign legislative power a *new subject* of taxation. It has never been doubted that the legislature may tax one's net income, which is another name for the surplus of his gross receipts over and above the proper expenses incurred in earning it. So, it would probably have the power, as in some States it is often the practice, to tax property upon the basis of a valuation fixed by deducting mortgage-liens, or other like incumbrances, from the cash market value; and this rule of assessment has never been adjudged to violate, so far as we are aware, that equality and uniformity in the rate of taxation, which is required by the constitution. Can we say that there is no such just connection between what a man *owns* in his proper right, and what he *owes* to others, as that it is beyond the scope of legislative sovereignty to set off the one against the other,

[Moog v. Randolph.]

in the adjustment of his revenue liabilities to the State? It is a familiar maxim, that courts of equity will consider that as done which ought to be done. Why, it may be inquired, can not this just maxim of equity jurisprudence be made to constitute the vital spirit, if not the actual basis, of legislative action, in matters of taxation and of the public revenue? According to the teaching of the soundest morality, the debtor is but a mere *trustee*, holding his effects in trust for the benefit of his creditors. Hence, one of the highest duties of every debtor, exacted alike by all laws, human and divine, is to pay his pecuniary obligations. For the enforcement of this moral and legal duty, the rules of the common law authorized the body of the debtor to be taken under execution; and, under the ancient provisions of the Jewish code, he could, at the option of the creditor, be sold into the bondage of involuntary servitude. Under our laws, the collection of debts can be enforced by many summary remedies, and the sanctity of their obligation is forbidden to be violated by any power of the State. The creditor can, by the process of garnishment, at any time fasten a lien upon the solvent credits of the debtor, a species of assets recognized by law as being peculiar in their nature. They are more readily converted into money than any other kind of property, and, in the traffic of commerce and the common business transactions of life, often passing as money. The one is money in hand, and the other is money due. Paper money itself, in a broad sense, is a solvent credit due by the bank to its bill-holder. These facts are pertinent, as illustrating the nature of this new subject of taxation, and of the equity of the whole plan of assessment, which, with its qualified exemptions, is sought to be graduated according to the tax-payer's pecuniary ability to contribute to the support of the government. It is suggestive, too, of the reasonableness of its separate *classification*, in the revenue system of the State. This system, it is true, does not operate with perfect equality,—a feature of taxation which is admitted by all to be unattainable. Practical approximation is all that can be expected, and, perhaps, all that is desirable. There is a relative uniformity, however, in its operation. He who is not indebted to-day may become so to-morrow. This uniformity is similar to that of the Federal Bankrupt Law, of 1867, which preserved in force the debtor's exemptions as they severally existed under the different laws of the various States, at a fixed and uniform time. These exemptions, though not exactly alike perhaps, in any two of the thirty-eight States of the Union, were adjudged not to be repugnant to the mandate of the Federal constitution, requiring the passage of a *uniform* bankrupt law throughout the Union.—Bump on Bank., 8th Ed. pp. 147, 509.

These considerations make us unwilling to declare that the amendment under review is violative of that uniformity of taxation required by sections 1 and 6 of Article XI of the State constitution. This view is strengthened by the doctrine, now considered as settled by the past decisions of this court, that the General Assembly of this State has the same unlimited power of legislation that resides in the British Parliament, except so far as that power may be restrained by the limitations of the constitution, Federal and State.—*Davis v. The State*, 68 Ala. 58; *Dorman v. The State*, 34 Ala. 216.

The point for decision, therefore, may be considered to belong to that class of doubtful cases which permits for its solution the invocation of the doctrine of *legislative construction*. The principle has often been declared, that constitutions are to be construed in the light of previously existing constitutions, and that a uniform legislative interpretation of a doubtful clause, running through many years, is of weighty consideration with the courts, as is also the contemporaneous exposition of the bar. The maxim, *contemporanea expositio est fortissima in lege*, is an accepted canon of judicial construction.—*Ex parte Hardy*, 68 Ala. 303; *Ex parte Selma & Gulf R. R. Co.*, 45 Ala. 696 ; Sedw. Stat. Law, 252. As we have said, the main clause of the present constitution, now under consideration, was found in the constitution of 1868. — Const. 1868, Art. IX, sec. 1. The legislature, on February 19, 1867, prior to the constitution of 1868, had passed a revenue law taxing "all solvent credits bearing interest," from which credits "the indebtedness of the tax-payer" was required to be deducted, "the excess only being taxed."—Acts 1866-67, p. 262, chap. II, sec. 2, subd. 4. The first legislature, meeting under this constitution, preserved this same clause in a revenue law enacted by it in the year 1868.—Acts 1868, p. 301, sec. 6, subd. 20. The same provision was contained in the revenue system adopted in March, 1875, a slight change only being made in its language, by adding to the phrase "solvent credits" the words "credits of value," thus showing that the attention of the law-making power was specially directed to the subject. Acts 1874-75, p. 7, sec. 6, subd. 19. At the December term of this court, in the same year, the case of the *Ala. Gold Life Ins. Co. v. Lott*, 54 Ala. 499, was decided, in which the question arose, as to whether or not the appellant was entitled to a deduction claimed to fall within the influence of this particular clause. While it was a disputed question as to whether solvent credits could be selected as a legitimate subject of taxation, the right of deducting the indebtedness of the tax-payer does not appear to have been even clouded with a doubt. The deduction was allowed, which could not have been done unless

the law in question was deemed constitutional. It is true that this decision can not be technically considered as an authority on this point, but it is cited to show a judicial acquiescence in the legislative construction. The constitutionality of a law, under which a litigated right is sought to be derived, is a question always before the court, whether presented by argument or not. It need never be specifically assigned as error, under the rule regulating such assignments upon the record. The tacit acceptance of a law, therefore, by the judiciary and the legal profession, is a part of its contemporaneous exposition.

The constitution of 1875, containing the same provision as that of 1868, which exacted the assessment of taxes in exact proportion to the value of property, went into effect in December of the year 1875. The members of the convention who adopted it were composed largely of the members of the various General Assemblies that had framed those revenue laws, extending back through the past decade of years. It was adopted .with a knowledge of its previous exposition. And since that time every revenue system adopted by each subsequent and successive General Assembly has contained a clause taxing solvent credits, and authorizing a deduction of the taxpayer's indebtedness—thus taxing, as in this case, the *surplus of his solvent credits over his indebtedness, as a newly created subject* elected to bear its proportionate burden in raising the public revenue.—Acts 1875–76, pp. 46-47, sec. 1, subd. 8 ; Acts 1876–77, p. 4, sec. 2, subd. 3.

The conclusion which we have above reached is fortified, to some extent, by a recent decision of the Supreme Court of Indiana, a State whose constitution has been construed to establish a system of strictly uniform taxation, excluding the operation of laws exempting any property from taxes, except such as is specially designated by its provisions. In the case of *Matter v. Campbell*, 71 Ind. 512, a law was sustained as valid which taxed " the total amount of all credits " belonging to the taxpayer, "*less* his *bona fide* indebtedness."

In view of these facts, we scarcely feel authorized to conclude, that, if the amendment under discussion had been incorporated in the enrolled bill, and been approved with the remainder of the law by the Governor, it could have been adjudged a nullity, as violative of the constitution. Its omission from the law was, therefore, material, and, under the principles first decided. the entire act was vitiated, because it never passed through the mandatory forms prescribed by the constitution for the enactment of a valid constitutional *law*.

I fully concur with the Chief-Justice in the views expressed by him as to the proper construction of section 5, of Article IV, of the present Constitution, fixing the time during which the

General Assembly is permitted to remain in session. I am satisfied that "fifty days" mean fifty legislative *working days*, exclusive of the Sundays, and other days upon which the Senate and House concur in refusing to sit by joint resolutions of adjournment. This question has been repeatedly considered by the judiciary committees of the Senate and House of Representatives, at successive sessions of the General Assembly, since the adoption of the Constitution; and their reports, concurring in this view, have in each instance been adopted by those bodies. Even if we regarded the question a doubtful one, we would hesitate to depart from this settled legislative construction of the fundamental law, especially in view of the serious consequences which would necessarily flow from it. The right to adjourn *ad libitum*, upon certain week days, and the right to *draw pay* for such days, are questions not necessarily dependent, the one on the other. The power to adjourn may exist, without the right to draw pay; and they are not convertible or correlative powers, as has been argued before us at the bar. This suggestion is not intended to cast any doubt upon previous decisions of this court, holding that the members of the General Assembly are entitled to draw their *per diem* pay on Sundays—a view in which we all fully concur.

Under the influence of these conclusions, it necessarily follows that the judge of the City Court erred in refusing to grant the prayer of the petitioner asking for the writ of *mandamus*.

STONE, J.—I concur in the opinion, that the section of the revenue law, the subject of contention in this suit, is inoperative, but I doubt the correctness of my brothers' views, in holding it vitiates the whole statute.