GEORGE WASHINGTON LIFE INSURANCE COMPANY *v.* BOARD OF REVIEW AND EQUALIZATION OF KANAWHA COUNTY

(No. 7402)

Submitted May 2, 1933.   Decided May 23, 1933.

*Homer A. Holt,* Attorney General . and *Ira J. Partlow,* Assistant Attorney General, for appellant.

*Price, Smith & Spilman, Blue, Dayton & Campbell, David W. Dunbar,* and *J. M. Woods,* for appellee.

KENNA, JUDGE:

In returning its personal property for taxation for the tax year beginning January 1, 1931, the George Washington Life

Insurance Company, a domestic life insurance company, listed its taxable bonds at market value, amounting to $684,559.00. It deducted from its taxable assets the sum of $50,244.00 as the aggregate of premiums and interest paid to it in advance, and also deducted the sum of $4,652,728.00, the cash surrender value reserve on its participating policies.

The assessor listed its bonds at their par value of $710,700.00. He refused to allow the deduction of $50,244.00 for premiums and interest paid in advance. He did allow deduction of the reserve for policy holders.

The Insurance Company took the matter before the Board of Equalization and Review of Kanawha county. The tax commissioner appeared by counsel before the board to oppose the company's method of assessing the bonds and to contest the deduction of premiums and interest paid in advance. The tax commissioner also injected the further question that the deduction, made in the return and apparently not questioned by the assessor, of $4,652,728.00 under the classification of "reserves policy holders" (meaning the aggregate of cash surrender value of all of the participating policies of the company) should not be allowed. After hearing, the board of equalization and review (1) assessed the bonds at their market value of $684,559.00; (2) refused to allow the deduction for premiums and interest paid in advance amounting to $50,244.00, and (3) refused to allow the deduction of $4,652,728.00 as owing by the company to its policy holders, thus increasing the amount of the taxable property of the company by that amount.

The Insurance Company appealed to the circuit court of Kanawha county on both of these disallowances.

The decision of the circuit court was that the item of $4,652.728.00 was deductible and that the item of $50,244.00 was not. The board of equalization and review prosecutes this appeal against the allowance of the deduction of $4,652,728.00, and the Insurance Company assigns cross-error seeking the allowance of the deduction in the amount of $50,244.00, representing interest and premiums paid in advance.

The record before us is not as complete in detail and definition as we would wish in a case of this importance. How-

ever, it seems to have been regarded by counsel on both sides as adequate to fully present the questions for decision. Mr. Fred Staunton, who testified before the board of equalization and review (this is the only testimony that we have before us), explaining the different items of the company's deductions claimed, stated as follows: "This 'reserves policy holders, $4,652,728', represents the actual, legal required reserve that has to be set up as of that date, January 1, 1931, to protect our policy contracts. The 'premiums and interest paid in advance, $50,244.00', represents just what it says, 'premiums and interest paid us in advance which has not been earned. It has been received by us but is not our property, etc. * * *.'' A great many more matters of fact are asserted in the brief of the company than appear from the proof before us. It appears from the brief that the method of accumulating this fund consists in the division and segregation of premium payments into three parts; first 10% set apart to conduct the business, second, approximately 35% set aside for the payment of current death losses, and third, approximately 55% set aside to build up a fund which maintains the cash surrender value of the participating policies in effect. It is this last fund that concerns us on the principal deduction. The item of $50,244.00 does not appear to have any definite actuarial classification and probably is a casual item representing a mere question of convenience in payment.

Counsel for the board of equalization and review in its brief and in oral argument raise the question that the principal deduction should not be allowed, because in making its return to the assessor, George Washington Life Insurance Company failed to break it down into its several items by listing the policy holders to whom the debt was supposed to have been payable as is claimed section 6, article 5, chapter 11, Code, contemplates. There is no pretense that the nature of the item and the basis upon which it was claimed as a deduction did not sufficiently appear from the return, that the assessor did not fully understand it, nor that it was not fully understood and fully heard before the board of equalization and review and before the circuit court. For every purpose the information furnished by the return has proven adequate to permit the question to be exhaustively and in-

telligently dealt with. While it may be true that in the ordinary case, the statute contemplates that debts claimed as deductions from the aggregate of personal assets returned for taxation be separately listed, it seems more or less obvious that the purpose of such listing is to permit the debts to be checked in their different categories as a test of the *bona fides* of the taxpayer's claim of deduction. Here, every single item going to make up the aggregate of the claimed deductions, is based upon exactly the same state of facts. The names of policy holders and amounts of their several cash surrender values only would differ if separately listed. The face of the return itself is sufficient to disclose that this is true. A break-down of the aggregate item of $4,652,728.00 would have furnished the assessor with no additional knowledge concerning the questions involved. It would have been a laborious, expensive and unprofitable undertaking involving a practical transcript of the records of the company which, without it, were readily available. However much we realize that laxity in these respects is not to be encouraged, under all of the circumstances, we hold that the tax return of the Insurance Company was a substantial compliance with the statute. In addition, since this return was made to the assessor, the matter has been reviewed by the board of equalization and review and also by the circuit court of Kanawha county. A similar question was before this court in *Mortgage & Discount Corp.* v. *Newcomer*, 101 W. Va. 292, 295, 132 S. E. 748, where it was observed: ''The suggestion is made in briefs of counsel that the assessor was derelict in not pursuing strictly the statute, in investigating the question of the *bona fides* of the note deducted in plaintiff's return. Any irregularity in that particular becomes unimportant, for this whole question was gone into on the hearing before the board of equalization and review, when the conclusion of the assessor was confirmed; and appellant was again accorded a hearing on the same question before the circuit court on writ of error there, where the conclusions of law and fact by said board were approved.''

The principal question presented is whether the aggregate of the cash surrender values of all of the company's participating policies in force is a deduction within the terms of

section 6, article 5, chapter 11, Official Code of 1931. That section allows to be deducted from money, credits, or investments of a taxpayer "the amount of the indebtedness which he owes to others as principal debtor". Is this item an indebtedness owed to others as principal debtor? The first thing to do is to define a debt. Without attempting to quote or cite the various authorities that have been examined on this question, which define debt in various ways and for different purposes, it may safely be laid down that a restricted definition of a debt is: an existing obligation arising out of contract, express or implied, to pay a certain sum of money or a sum of money susceptible of being made certain at the time of payment, to a certain person on demand or at a fixed time. A debt might be defined much more broadly, but certainly an obligation falling within the foregoing restricted definition *is* a debt. If this, for the purpose before us, be accepted as the definition of a debt, then, of course, a person's indebtedness is the aggregate of the individual debts he owes.

Now what is this fund of $4,652,728.00? What is the nature of the obligation represented by it? Section 9, article 3, chapter 33, Official Code of 1931, prescribes the kind of life insurance policies that may be issued by domestic companies issuing participating policies, and requires that all policies issued by such companies give to the holders full right to participate in the accumulations of the company. Section 10 lays down the method of distributing the surplus and the rights of the policy holder to participate therein and directs the distribution to the policy holder at maturity of the policy of any apportioned surplus not paid to the insured or applied to the reduction of premiums, or the purchase of paid-up insurance or endowment additions. Section 3 of the same article requires the setting up of a cash surrender reserve fund in the manner laid down. Sections 20, 21, 22, 23, 25 and 26 lay down the requirements and regulations concerning the handling of funds and investments of life insurance companies. Section 18 provides, in the event of lapse after three annual premiums are paid, that the pro rata share of the reserve of the policy holder shall be paid to him upon demand made within thirty days or shall purchase for him paid-up insurance. Section 28 directs the application of the policy holder's pro

rata share in the reserve in the event of the company's insolvency. Section 31 provides expressly that in any proceeding under section 28, the liabilities of the company shall be held to include "the net present value of the policies of such company or re-insurance reserve ascertained as required by law". It is under these sections that the policy contract is written and out of them grows the obligation to the policy holder claimed as a deduction. All of these sections must be read into the policy contract. That contract especially sets up the cash surrender and loan values, provides for extended insurance in event of lapse, provides for the apportionment of surplus, etc., and otherwise complies with the requirements of the statute.

The foregoing sections of the insurance law of this state are not referred to for the purpose of assisting in the interpretation or construction of section 6, article 5, chapter 11, the section providing for deduction of indebtedness from money, credits and investments for tax purposes. The definition of the word "indebtedness" under the section last referred to is independently arrived at. But it cannot be gainsaid that the statute law of this state imposes upon domestic life insurance companies not only the terms and form of the contract that they may sell, but what they shall do with the premiums received for that contract from the moment that they get them until the moment that they are required to pay them out. Life insurance is a *quasi* public business. The statutory regulations of it are stringent. Shall the state be enabled to say to a life insurance company that it shall make such and such a contract, that on payment of the premium it shall handle and invest it so and so, that it shall carry a certain part of it in an irreducible reserve, and shall pay it out in accordance with the regulations prescribed by the state, and then refuse to look to these impositions of its own for the purpose of determining the life insurance company's status for taxation purposes? Such a procedure would be manifestly unfair and illogical.

We have hereinbefore defined a debt in a restricted sense (not intended to be a comprehensive nor general definition) and it remains to be asked whether, in the light of its policy contract and the impositions of the state statute laws, this

policy reserve fund of the insurance company falls within the terms of that definition. Is it an existing obligation? Most certainly so, by the terms of the policy contract and of the very law itself. Does it arise out of contract? Assuredly, and arises to a higher level by virtue of the statute. Does it require the payment of a certain sum of money? Beginning in the third year, by the very terms the law itself imposes in the policy contract, it does. Is the payment to be made to a certain person? The policy holder. Is it payable at a fixed time or on demand? It cannot be otherwise under the statute. So that, having defined a debt under the tax statute, and having turned to the policy contract and to the insurance laws of the state to find the characteristics of this obligation, we determine that the characteristics of the obligation fall within the terms of the definition.

But we are urged to say that this is exempting property from taxation. We do not think so. Section 6, article 5, chapter 11 of the Code, is not designed to exempt property from taxation. Its purpose is to prescribe a method by which the true taxable value may be arrived at. Another of its purposes is to limit double taxation. Otherwise, on the one hand, a tremendous brake would be placed upon the use of credit and the consequent flow of trade and business; and on the other, the class of persons most actively sustaining the prosperity of the community would be penalized. Certainly, the company, by virtue of the fact that this fund is in its custody and under its control (severely restricted by law as that control is), and by reason of the fact that earnings of the fund above the amount necessary to maintain the legal reserve go to the company, has an interest which arises by reason of the fund. However, it seems plain, that an interest that arises *by reason* of the fund is clearly distinguishable from an interest *in* the fund itself. This distinction is too broad to require protracted discussion.

It would seem apparent that the cash surrender value of participating policies of life insurance is plainly taxable to the policy holder. If this fact can be postulated, then for a determination of the questions involved, it is not necessary to consider that such a tax is not, perhaps from want of appropriate legislation to assess and enforce it, actually imposed.

The fact that the property in the policy is owned by the policy holder by virtue of the fact that under his law-imposed contract the value is at all times at his disposal, would seem to make a situation that must be taken into consideration. If this be true, then it would seem logically to follow that assessing the same value to the insurance company would necessarily be laying the ground for double taxation. This result is to be avoided in the absence of clear and express legislative mandate that it be brought about. In the language of Mr. Justice Waite in *Tennessee* v. *Whitworth*, 117 U. S. 129, 6 S. Ct.\ 645, 29 L. Ed. 830, page 137, ''Double taxation is, however, never to be presumed. Justice requires that the burdens of government shall as far as practicable be laid equally on all, and, if property is once taxed in one way it would ordinarily be wrong to tax it again in another way, when the burdens of both taxes fall on the same person. Sometimes tax laws have that effect; but if they do, it is because the legislature has unmistakably so enacted. All presumptions are against such an imposition.'' To hold here that the life insurance company is taxable with the aggregate of the cash surrender value represented by the reserve set up to meet it, would not dispose of the proposition that the same property represented by the separate cash surrender values of the policies in the hands of the policy holders, is also taxable. The question of whether legislation has been enacted that makes this tax feasible, is beside the point, and to urge its not having been enacted as an argument for this tax to be laid to the hands of the insurance company, is mere argument of expediency, which does not enter into the solution of the problem before us. Neither are we impressed with the argument that because policy holders reside in other states assessing this fund to policy holders would permit a large part of the fund to escape taxation here. If this property is not properly taxable in this state, then it should not be taxed here. The question of double taxation does not necessarily resolve the problem before us. Our law permits it, but avoids it unless the legislative intent to bring it about is manifest. Supposing that there are two persons each having a property right in the same subject matter and carved out of the same substance by methods recognized by law, the question yet remains: From which shall the law exact its

672

tribute to the state in the form of taxation? The answer to this question would seem to lie in determining which has the nearest to an absolute, free and untrammeled ownership and use in the subject matter. If this be a reasonable predicate, then in this matter we have no difficulty. On the one hand, we have the policy holder, the value of whose interest is determined, evidenced by his policy, and set up on ready standards in a manner giving it the very highest degree of commercial mobility. On the other hand, we have the life insurance company, custodian of the fund from which this value in the policy holder arises, with what is tantamount to only a highly circumscribed fiduciary use of the property. It has no proprietary right in the corpus of the fund. When once received by the company it cannot divest itself of any part of it, except for the benefit of its policy holders and in the manner prescribed by law. True, it can control it within these restricted bounds. However, the theory upon which these restrictions are imposed, contradicts the theory of ownership in the company. The legislature, in enacting our insurance laws and in imposing restrictions upon the handling of insurance funds, was without doubt acting to protect those persons recognized by it as having paramount rights in the accumulated values.

Owing to the differences that exist in both the tax laws and the insurance laws of the various states, it is difficult, without great tedium, to cite authorities directly in point on the questions here involved. However, a full examination of the case law of this country will disclose that, for reasons closely in line with those herein given, the weight of authority and of reason sustains the deduction from taxable money, credits and investments under taxing statutes similar to our own of the cash surrender value reserves of life insurance companies. Some of the cases sustaining this view are the following: *Alabama Gold Life Ins. Co.* v. *Lott,* 54 Ala. 499; *Equitable Life Ins. Co.* v. *Board of Equalization,* 74 Ia. 178, 37 N. W. 141; *Michigan Mutual Life Ins. Co.* v. *Detroit,* 133 Mich. 408, 95 N. W. 1131; *State ex rel. Newark* v. *Lewis,* 83 N. J. L. 802, 86 Atl. 1102; *Central Life Assurance Society* v. *Des Moines,* 212 Ia. 1254. 238 N. W. 535; *Hess* v. *Columbia Life Ins. Co.,* 116 Ohio St. 416, 156 N. E. 504.

We do not think it necessary to invoke the rule of practical construction, argued by counsel for the life insurance company. It does, however, in our opinion, add weight to the conclusion here reached. Assessments against life insurance companies have been laid for more than twenty-five years, with this deduction allowed. It has never before been questioned by any tax assessing authority. It will not do to say that it may never have been brought to their attention. It was their duty to have attended to it, and we must presume that they did that duty. So, for more than a quarter of a century this obligation has been construed by tax assessing authorities as a proper deduction. In the absence of better reason, this would be a cogent argument in favor of allowing it.

There is a well recognized distinction between the treatment of cash surrender reserves of life insurance companies and the treatment of unearned premiums of fire insurance companies, for tax purposes. This distinction is clearly drawn in the cases and a full discussion of it here would be without purpose. It is upon this distinction that this case is to be set apart from the case of *Wheeling Fire Ins. Co.* v. *Board of Equalization and Review,* 111 W. Va. 161, 161 S. E. 427. That being a fire insurance case involving the question of whether the unearned premiums of a fire insurance company could be deducted from taxable money, credits and investments, under section 6 of article 5 of chapter 11 of the Code of 1931, its decision did not turn upon the principles herein discussed.

For the reasons hereinbefore given, we affirm the ruling of the circuit court in allowing the deduction as indebtedness of the "reserve for policy holders" in the amount of $4,-652,728.00.

It remains to consider the cross-error assigned by the life insurance company to the ruling of the circuit court refusing to allow as a deduction an item of $50,244.00 returned as the aggregate of premiums and interest paid to the company in advance. It was conceded by counsel for the company in oral argument that this item does not constitute a proper deduction, and the cross-error was not stressed in either the brief or in oral argument. The principles governing the question of this proposed deduction, we think, have been well considered and

674

decided in the case of *Wheeling Fire Ins. Co.* v. *Board of Equalization and Review*, 111 W. Va. 161, 161 S. E. 427. According to the principles laid down in that case, the deduction is not proper, and, consequently, the ruling of the circuit court in refusing to allow it, is affirmed.

*Affirmed.*