Rel: December 22, 2022

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

_____

## 1210353

_____

## Gulf Shores City Board of Education and Kelly Walker

### v.

**Eric Mackey, in his official capacity as Superintendent of the Alabama State Board of Education; Teddy J. Faust, Jr., in his official capacity as Revenue Commissioner of Baldwin County; James E. Ball, Joe Davis III, Billie Jo Underwood, and Charles F. Gruber, in their official capacities as Commissioners of Baldwin County; Baldwin County Board of Education; Baldwin County Circuit Judge Carmen E. Bosch, in her official capacity as Presiding Judge of the Baldwin County Juvenile Court; Robert Wilters, in his official capacity as Baldwin County District Attorney; and Coastal Alabama Community College**

**Appeal from Montgomery Circuit Court**
**(CV-21-900953)**

BOLIN, Justice.

The Gulf Shores City Board of Education ("the Gulf Shores Board") and Kelly Walker ("the plaintiffs") appeal from the judgment of the Montgomery Circuit Court dismissing their complaint seeking certain declaratory and mandamus relief against Eric Mackey, in his official capacity as Superintendent of the Alabama State Board of Education ("the superintendent"); Teddy J. Faust, Jr., in his official capacity as Revenue Commissioner of Baldwin County ("the revenue commissioner"); James E. Ball, Joe Davis III, Billie Jo Underwood, and Charles F. Gruber, in their official capacities as Commissioners of Baldwin County ("the county commissioners"); the Baldwin County Board of Education ("the Baldwin County Board"); Baldwin County Circuit Judge Carmen E. Bosch, in her official capacity as Presiding Judge of the Baldwin County Juvenile Court, and Robert Wilters, in his official capacity as the Baldwin County District Attorney ("the judicial defendants"); and Coastal Alabama Community College ("CACC").

<u>Facts and Procedural History</u>

Alabama's statutory framework for funding public education includes allowing a county to levy certain taxes to support the public schools in the county. For example, § 16-13-160 and § 16-13-180, Ala. Code 1975, allow a county to impose, respectively, a one-mill ad valorem tax and a three-mill ad valorem tax for the purpose of funding public education in the county. Section 16-13-31(b), Ala. Code 1975, provides for the apportionment of proceeds collected pursuant to such taxes:

> "(b) The tax collector/revenue commissioner of each county shall apportion county-wide taxes collected for the purposes of participating in the Foundation Program to each local board of education in the county on the basis of the total calculated costs of the Foundation Program for those local boards of education within the county. The total calculated costs of the Foundation Program for each local board of education shall be the sum of state funds received from the Foundation Program and the amount of local effort required pursuant to paragraph a. of subdivision (3) of subsection (b) of Section 16-13-231[, Ala. Code 1975]."

In addition, pursuant to § 40-12-4, Ala. Code 1975, a county has the authority to impose franchise, excise, and privilege license taxes for the purpose of funding education in the county. Section 40-12-4 provides, in pertinent part:

> "(a) In order to provide funds for public school purposes, the governing body of each of the several counties in this state is hereby authorized by ordinance to levy and provide for the assessment and collection of franchise, excise and privilege

3

license taxes with respect to privileges or receipts from privileges exercised in such county, which shall be in addition to any and all other county taxes heretofore or hereafter authorized by law in such county. Such governing body may, in its discretion, submit the question of levying any such tax to a vote of the qualified electors of the county. If such governing body submits the question to the voters, then the governing body shall also provide for holding and canvassing the returns of the election and for giving notice thereof. All the proceeds from any tax levied pursuant to this section less the cost of collection and administration thereof shall be used exclusively for public school purposes, including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor.

"(b) Notwithstanding anything to the contrary herein, the governing body shall not levy any tax hereunder measured by gross receipts, except a sales or use tax which parallels, except for the rate of tax, that imposed by the state under this title. Any such sales or use tax on any automotive vehicle, truck trailer, trailer, semitrailer, or travel trailer required to be registered or licensed with the probate judge, where not collected by a licensed Alabama dealer at time of sale, shall be collected and fees paid in accordance with the provisions of Sections 40-23-104 and 40-23-107, [Ala. Code 1975,] respectively. No such governing body shall levy any tax upon the privilege of engaging in any business or profession unless such tax is levied uniformly and at the same rate against every person engaged in the pursuit of any business or profession within the county; except, that any tax levied hereunder upon the privilege of engaging in any business or profession may be measured by the number of employees of such business or the number of persons engaged in the pursuit of such profession. In all counties having more than one local board of education, revenues collected under the provisions of this section shall be distributed within such county on the same basis of the total calculated costs for the Foundation

4

Program for those local boards of education within the county."

The Foundation Program referenced in § 16-13-31(b) and § 40-12-4(b) was created by the legislature pursuant to § 16-13-230 et seq., Ala. Code 1975. The Foundation Program Fund is a fund established for the benefit of public education in this state and is composed of appropriations made by the legislature. § 16-13-230, Ala. Code 1975. The requirements for a local board of education to participate in the Foundation Program and the formulas for determining the cost of the program and how funds are apportioned to local boards are set forth in § 16-13-231, Ala. Code 1975. Further, § 16-13-237, Ala. Code 1975, provides that "[i]t is not the intent of the Legislature to require, and the Legislature expressly so declares that it does not require, any county to provide funding to any city board of education beyond the city board of education's pro rata share of any countywide tax."

This case involves the interplay among § 16-13-31(b), § 40-12-4, and § 45-2-244.077, Ala. Code 1975, a part of § 45-2-244.071 et seq., Ala. Code 1975 ("the local-tax act"), which authorizes the Baldwin County Commission to levy a 1% sales tax in Baldwin County paralleling the state sales tax found in § 40-23-1 through § 40-23-4, Ala. Code 1975 ("the

5

local tax"). Section 45-2-244.077 provides how proceeds of the local tax are to be disbursed. Act No. 83-532, Ala. Acts 1983, was the initial act authorizing the local tax; § 8 of that act provided, in part:

> "All revenues arising from the taxes herein authorized to be levied shall be distributed as follows: (a) Fifty-five percent (55%) shall be distributed to the Baldwin County board of education to be utilized exclusively for capital improvement, capital construction and maintenance purposes; (b) five percent (5%) shall be distributed to Faulkner State Junior College[1] in Bay Minette to be used as other appropriations to said school are used; and (c) forty percent (40%) shall be deposited in the general fund of the county to be expended as other county funds. Provided, however, in the initial fiscal year that this sales tax is levied, prior to any distribution provided herein, a one-time disbursement of two percent (2%) of all revenues arising from said tax shall be appropriated for the erection of a suitable county animal pound as provided in Section 3-7-7, Code of Alabama 1975."

Act No. 84-523, Ala. Acts 1984, amended § 8 of Act No. 83-532 by adding the following sentence:

> "Effective for the fiscal year beginning October 1, 1984, and each fiscal year thereafter, prior to any other distribution, two percent (2%) of all net revenues herein collected shall be appropriated to the juvenile court for Baldwin County to be used for the leasing or building, staffing, and operation of a home for juveniles."

---

[1]Faulkner State Junior College is now CACC.

In May 2017, the legislature enacted Act No. 2017-447, Ala. Acts 2017, which modified the designated recipients of the proceeds of the local tax as follows:

> "Prior to any other distribution, two percent of all net revenues herein collected shall be appropriated to the Juvenile Court for Baldwin County to be used for drug interdiction and education programs; staffing; and the leasing, building, staffing, and operation of a home for juveniles; and one percent of all net revenues collected shall be appropriated to the Baldwin County District Attorney's Office to be expended for education and intervention programs, with emphasis on grades kindergarten through 12, aimed at the prevention of drug and alcohol abuse, sexual misconduct, bullying and other issues, and for other prosecution services. After the distribution to the Juvenile Court and District Attorney's Office as provided in this section, the remaining net revenues arising from the taxes herein authorized to be levied shall be distributed as follows: (1) 40 percent shall be distributed to the Baldwin County Board of Education to be utilized exclusively for capital improvement, capital construction, and maintenance purposes; (2) five percent shall be distributed to Coastal Alabama Community College in Bay Minette and shall be used only in the county as other appropriations to the school are used; and (3) 55 percent shall be deposited in the general fund of the county to be expended as other county funds provided that not less than 20 percent of the proceeds shall be expended for road and bridge construction, capacity improvements, paving, resurfacing, and/or maintenance of roads and bridges."

Act No. 2017-447 became effective on June 1, 2018. The disbursement scheme set forth in Act. No. 2017-447 is codified at § 45-2-244.077.

On October 9, 2017, the Gulf Shores Board was created to oversee an independent city school district pursuant to a resolution adopted by the City of Gulf Shores. Thereafter, the Gulf Shores Board and the Baldwin County Board entered into negotiations that resulted in a separation agreement pursuant to which the Gulf Shores Board obtained certain assets and assumed certain liabilities of the Baldwin County Board. Additionally, the separation agreement provided that taxes collected specifically to fund public schools in Baldwin County -- including ad valorem taxes authorized under § 16-13-160 and § 16-13-180 and franchise, excise, and privilege license taxes authorized under § 40-12-4 -- would be apportioned according to the apportionment provisions in § 16-13-31(b) and § 40-12-4(b) so as to include the Gulf Shores Board as a recipient. However, the separation agreement did not address apportionment of the proceeds of the local tax. The president of the Gulf Shores Board stated in his affidavit that the "parties specifically agreed to disagree [as to] whether the [local] tax was required to be apportioned." The Gulf Shores Board has demanded but has not received a share of the local-tax proceeds. The Baldwin County Board has received all of the local-tax proceeds apportioned to it in § 45-2-244.077.

8

On September 2, 2021, the plaintiffs filed their initial complaint against the superintendent, the revenue commissioner, and the county commissioners, seeking mandamus relief requiring that the local-tax proceeds be apportioned to include the Gulf Shores Board as a recipient and/or a judgment declaring that the local-tax act is unconstitutional.

On September 13, 2021, the Baldwin County Board moved to intervene in the action, arguing that it would lose substantial revenue if the local-tax proceeds were apportioned to include the Gulf Shores Board as a recipient or the local-tax act was found to be unconstitutional. The Baldwin County Board also moved to require the joinder of the judicial defendants, pursuant to Rule 19, Ala. R. Civ. P., because § 45-2-244.077 provides for the distribution of a portion of the local-tax proceeds to the Baldwin County Juvenile Court and the Baldwin County District Attorney's Office. On that same day, CACC moved to intervene in the action.

On September 14, 2021, the circuit court entered separate orders granting the motions to intervene filed by the Baldwin County Board and CACC. The circuit court ordered that those parties be added so that they could oppose the claims asserted in the complaint. On September 15,

2021, the circuit court entered an order granting the Rule 19 motion to join the judicial defendants and ordered that the judicial defendants be joined as parties to the action.

On September 23, 2021, the plaintiffs filed their amended complaint asserting four counts. In the first three counts, the Gulf Shores Board sought identical relief against the superintendent, the county commissioners, and the revenue commissioner, respectively: mandamus relief directing the superintendent, the county commissioners, and/or the revenue commissioner to "allocate the proceeds of all sales and use taxes raised for educational purposes within Baldwin County, Alabama, in accordance with Ala. Code §§ 40-12-4 and 16-13-31(b)" or, alternatively, a judgment declaring the local-tax act to be unconstitutional on the basis that it violates Art. IV, § 105, of the Alabama Constitution of 1901. In count four, Walker asserted that the local-tax act imposes a tax upon the citizens located in the Gulf Shores school district that is not apportioned to and used in the Gulf Shores school district and, thus, sought a judgment declaring the local-tax act unconstitutional. The plaintiffs included a "joinder" section in the amended complaint, joining the judicial defendants as ordered by the circuit court and asserting the same

claims against those defendants. It does not appear that the plaintiffs expressly added the Baldwin County Board or CACC as party opponents, as ordered by the circuit court.

On October 5, 2021, the revenue commissioner and the county commissioners moved the circuit court to dismiss the claims asserted against them pursuant to Rule 12(b)(6), Ala. R. Civ. P., arguing that the plain language of the local-tax act did not require apportionment to the Gulf Shores Board and that the local-tax act is constitutional.

On October 7, 2021, CACC moved the circuit court to dismiss the claims asserted against it pursuant to Rule 12(b)(6), arguing that the local-tax act is constitutional and does not violate § 105 of the Alabama Constitution. CACC further argued that the plaintiffs' assertion that the local-tax proceeds make up funds needed for the Foundation Program was incorrect.

On October 26, 2021, the superintendent moved the circuit court to dismiss the claims asserted against him pursuant to Rule 12(b)(1) and Rule 12(b)(6), arguing that, in his official capacity, he is not a proper party to this action for declaratory and mandamus relief. Alternatively, the superintendent argued that the claims asserted against him were due

to be dismissed because he cannot be compelled to exercise his discretion as the superintendent in favor of the plaintiffs.

On October 27, 2021, the judicial defendants moved the circuit court to dismiss the claims asserted against them pursuant to Rule 12(b)(1), Rule 12(b)(6), and Rule 12(b)(7).  The judicial defendants argued that the plaintiffs' amended complaint failed to join the Baldwin County Board and CACC as ordered by the circuit court and that the failure to join those parties is a jurisdictional defect that required dismissal of the complaint; that the plaintiffs lacked standing to pursue their constitutional claims because those claims were nonjusticiable; and that the plaintiffs had failed to state a claim upon which relief could be granted.  Also on October 27, 2021, the Baldwin County Board moved the circuit court to dismiss the claims asserted against it and adopted the arguments of the other defendants.

On January 10, 2022, the plaintiffs filed their omnibus response in opposition to the motions to dismiss, arguing that the question whether the tax levied pursuant to the local-tax act is for "public school purposes" as that term is defined in § 40-12-4 is not suitable for resolution on a motion to dismiss; that the requirements for a local board of education's

participation in the Foundation Program include accounting for all countywide taxes used to fund education, including sales and use taxes such as the local tax; that the plaintiffs have standing to challenge the constitutionality of the local-tax act; that the plaintiffs' complaint states a valid claim that the local-tax act violates § 105 of the Alabama Constitution; that Walker's claim asserted in count four states a claim upon which relief can be granted; that the superintendent is a proper party to this action and that the claims were sufficiently pleaded against him; and that the plaintiffs have joined all necessary parties.

Following a hearing, the circuit court, on February 2, 2022, entered an order granting the motions to dismiss the plaintiffs' claims. The plaintiffs appeal, challenging primarily the circuit court's determinations that they lacked standing and that they had failed to state claims upon which relief could be granted.

## Standard of Review

The standard of review applicable to a judgment granting a motion to dismiss based on a lack of standing is as follows:

> "'A ruling on a motion to dismiss is reviewed without a presumption of correctness. This Court must accept the allegations of the complaint as true. Furthermore, in reviewing a ruling on a

motion to dismiss we will not consider whether the pleader will ultimately prevail but whether the pleader may possibly prevail.'

"Newman v. Savas, 878 So. 2d 1147, 1148-49 (Ala. 2003) (citations omitted). 'Matters of subject-matter jurisdiction are subject to de novo review.' DuBose v. Weaver, 68 So. 3d 814, 821 (Ala. 2011). '"'When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction.'"' Blevins v. Hillwood Office Ctr. Owners' Ass'n, 51 So. 3d 317, 321 (Ala. 2010) (quoting Riley v. Pate, 3 So. 3d 835, 838 (Ala. 2008), quoting in turn State v. Property at 2018 Rainbow Drive, 740 So. 2d 1025, 1028 (Ala. 1999))."

Poiroux v. Rich, 150 So. 3d 1027, 1033 (Ala. 2014).

The standard of review applicable to a judgment granting a motion to dismiss pursuant to Rule 12(b)(6) is as follows:

"'On appeal, a dismissal is not entitled to a presumption of correctness. ... The appropriate standard of review under Rule 12(b)(6)[, Ala. R. Civ. P.,] is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle [the pleader] to relief. ... In making this determination, this Court does not consider whether the plaintiff will ultimately prevail, but only whether [the plaintiff] may possibly prevail. ... We note that a Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.'"

Carr v. International Refin. & Mfg. Co., 13 So. 3d 947, 952 (Ala. 2009) (quoting Nance v. Matthews, 622 So. 2d 297, 299 (Ala. 1993)).

Discussion

14

I. <u>The Gulf Shores Board</u>

The plaintiffs argue that the circuit court's judgment, insofar as it determined that the Gulf Shores Board lacked standing to pursue its claims asserted in counts one through three of the complaint, ignores specific relief requested in those counts, namely, mandamus relief requiring the superintendent, the county commissioners, and/or the revenue commissioner "to allocate the proceeds of all sales and use taxes raised for educational purposes within Baldwin County, Alabama, in accordance with Ala. Code §§ 40-12-4 and 16-13-31(b)." The circuit court, in its judgment, addressed the standing issue, which had been raised by the judicial defendants in their motion to dismiss, as follows:

> "[T]he Plaintiffs cannot establish a likelihood that the injury complained of will be redressed by a favorable decision. It is not within the province of this Court to re-write the local 1983 tax act (as amended) in order to re-apportion tax proceeds earmarked for the Baldwin County Board of Education (BCBOE) for capital improvements, etc. between BCBOE and GSCBOE; rather, it is the duty of any Court to strike down those laws which are unconstitutional. In the instant matter, if, as the Plaintiffs argue, the local tax act impermissibly apportions tax proceeds for public school purposes to one school district to the exclusion of another school district within the county, it follows that the provision of the act allocating money exclusively to Baldwin County Board of Education must fail. Alternatively stated, if the provision at issue in this action fails, neither BCBOE nor GSCBOE would receive any tax proceeds. GSCBOE would receive no tangible

benefit. While the undersigned has cogitated on the Plaintiffs' argument that the local statute can still be saved by applying the distribution scheme undergirding Ala. Code § 40-12-4, to hold so would effectively result in re-writing the local statute. Based on the foregoing, it does not appear the injury in fact suffered by GSCBOE is redressable by this Court, and as such, GSCBOE has no standing to proceed."

Although the circuit court certainly did not provide an in-depth analysis regarding the claims seeking an order appropriating funds to the Gulf Shores Board based on the provisions set forth in § 40-12-4 and § 16-13-31(b), we cannot say that the circuit court ignored or wholly failed to address those claims; the circuit court expressly found that the provisions of the local-tax act could not be rewritten by the courts to provide for an appropriation to the Gulf Shores Board of a portion of the tax proceeds raised pursuant to the local-tax act. The issue whether, under the local-tax act or § 40-12-4 and § 16-13-31(b), the Gulf Shores Board is entitled to an appropriation of a portion of the tax proceeds raised pursuant to the local-tax act will be thoroughly discussed infra.

The plaintiffs argue that § 16-13-31(b) provides that all taxes "collected for the purposes of participating in the Foundation Program" shall be apportioned among the school districts in each county. They contend that the taxes collected by Baldwin County pursuant to the local-

16

tax act are taxes that are required to be paid into the Foundation Program and, thus, are subject to the apportionment mandate in § 16-13-31(b). The plaintiffs contend that the complaint asserts a claim that the apportionment mandate of § 16-13-31(b) and § 16-13-237 apply to the taxes collected pursuant to the local-tax act that are earmarked for education purposes, i.e., the taxes apportioned to the Baldwin County Board. Section 16-13-31(b) provides that the tax collector/revenue commissioner of each county shall apportion countywide taxes "collected for the purposes of participating in the Foundation Program" to each local board of education in the county. Therefore, the plaintiffs conclude that the complaint alleges an injury to the Gulf Shores Board that is connected to the conduct complained of and that could be redressed by a favorable ruling ordering an apportionment of a portion of the local-tax proceeds to the Gulf Shores Board.

This Court has often stated:

> "'"When the language of a statute is plain and unambiguous, ... courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning -- they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature." ...

17

> "'"In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
>
>> "'"'"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."'"'"

Ex parte Dorough, 773 So. 2d 1001, 1003 (Ala. 2000)(quoting Ex parte Pfizer, Inc., 746 So. 2d 960, 964 (Ala. 1999)).

By enacting the local-tax act, the legislature has authorized the Baldwin County Commission to "levy and impose, in addition to all other taxes, … a special county privilege license tax paralleling the state sales tax." § 45-2-244.072. As originally enacted, the local-tax act expressly provided, in pertinent part:

> "All revenues arising from the taxes herein authorized to be levied shall be distributed as follows: (a) Fifty-five percent (55%) shall be distributed to the Baldwin County board of education to be utilized exclusively for capital improvement, capital construction and maintenance purposes; (b) five percent (5%) shall be distributed to Faulkner State Junior College in Bay Minette to be used as other appropriations to said school are used; and (c) forty percent (40%) shall be

18

deposited in the general fund of the county to be expended as other county funds."

Act No. 83-532, § 8. As discussed above, the legislature, in May 2017, enacted Act No. 2017-447, which, among other things, modified the designated recipients of the local-tax proceeds and the amount of the local-tax proceeds the recipients would receive. Act No. 2017-447 provided for distribution of those tax proceeds as follows:

"Prior to any other distribution, two percent of all net revenues herein collected shall be appropriated to the Juvenile Court for Baldwin County to be used for drug interdiction and education programs; staffing; and the leasing, building, staffing, and operation of a home for juveniles; and one percent of all net revenues collected shall be appropriated to the Baldwin County District Attorney's Office to be expended for education and intervention programs, with emphasis on grades kindergarten through 12, aimed at the prevention of drug and alcohol abuse, sexual misconduct, bullying and other issues, and for other prosecution services. After the distribution to the Juvenile Court and District Attorney's Office as provided in this section, the remaining net revenues arising from the taxes herein authorized to be levied shall be distributed as follows: (1) 40 percent shall be distributed to the Baldwin County Board of Education to be utilized exclusively for capital improvement, capital construction, and maintenance purposes; (2) five percent shall be distributed to Coastal Alabama Community College in Bay Minette  and shall be used only in the county as other appropriations to the school are used; and (3) 55 percent shall be deposited in the general fund of the county to be expended as other county funds provided that not less than 20 percent of the proceeds shall be expended for road and bridge construction, capacity

improvements, paving, resurfacing, and/or maintenance of roads and bridges."

See § 45-2-244.077. Although Act No. 2017-447 was enacted by the legislature in May 2017, it did not become effective until June 1, 2018, after the Gulf Shores Board and school district were created. Nothing in the plain language of the local-tax act, as originally enacted or as amended, can be read as requiring and/or authorizing an allocation of a portion of the local-tax proceeds that are earmarked for the Baldwin County Board to the Gulf Shores Board. The plaintiffs conceded this point during the hearing on the motions to dismiss, stating:

> "If you look just at 1983 Tax Act is what we call it -- if you look just at that in a vacuum, we don't really argue that allocation is required, if that's all you're looking at. That's what the defendants want you to do is just look at the terms of that statute and see what it says. I agree it doesn't say that you have to allocate."

Based on the plain language of the local-tax act, none of the tax proceeds generated by the local-tax act are allocable to the Gulf Shores Board.

Although the tax proceeds generated by the local-tax act are not allocable to the Gulf Shores Board based on the clear language of the local-tax act, the plaintiffs further contend that those tax proceeds may

be allocated to the Gulf Shores Board under the provisions of § 40-12-4 and § 16-13-31(b). Section 40-12-4 provides, in pertinent part:

"(a) In order to provide funds for public school purposes, the governing body of each of the several counties in this state is hereby authorized by ordinance to levy and provide for the assessment and collection of franchise, excise and privilege license taxes with respect to privileges or receipts from privileges exercised in such county, which shall be in addition to any and all other county taxes heretofore or hereafter authorized by law in such county. … All the proceeds from any tax levied pursuant to this section less the cost of collection and administration thereof shall be used exclusively for public school purposes, including specifically and without limitation capital improvements and the payment of debt service on obligations issued therefor.

"(b) … In all counties having more than one local board of education, revenues collected under the provisions of this section shall be distributed within such county on the same basis of the total calculated costs for the Foundation Program for those local boards of education within the county."

(Emphasis added.) The plain language of § 40-12-4 requires that, in order for tax proceeds to be apportioned under that Code section, the taxes must be "levied pursuant to [that] section" and "collected under the provisions of [that] section." Obviously, the local tax is not a tax that is "levied pursuant to" or "collected under the provisions" of § 40-12-4.

Section 16-13-31(b) provides:

"(b) The tax collector/revenue commissioner of each county shall apportion county-wide taxes collected for the

21

> purposes of participating in the Foundation Program to each local board of education in the county on the basis of the total calculated costs of the Foundation Program for those local boards of education within the county. The total calculated costs of the Foundation Program for each local board of education shall be the sum of state funds received from the Foundation Program and the amount of local effort required pursuant to paragraph a. of subdivision (3) of subsection (b) of Section 16-13-231."

(Emphasis added.) The plain language of § 16-13-31(b) expressly provides that the tax proceeds apportioned pursuant to that Code section must be "collected for the purposes of participating in the Foundation Program." The plaintiffs contend that the tax proceeds generated by the local-tax act are included in the Foundation Program and can be apportioned to the Gulf Shores Board. However, the plaintiffs have not demonstrated to this Court how the local tax is "collected for the purposes of participating in the Foundation Program" and, therefore, how the proceeds of the local tax are allocable to the Gulf Shores Board pursuant to § 16-13-31(b). The Foundation Program itself was not approved by the legislature until July 1995, and it was predated by the enactment of Act No. 83-532, which initially authorized the local tax, by approximately 12 years. Act No. 2017-447, the most recent amendment of the local-tax act, did not provide that the local tax be "collected for the purposes of

participating in the Foundation Program." Section 16-13-231(b)(3) identifies the funds available for funding the Foundation Program Fund and requires a local effort on the part of each participating local board of education to share in the cost of the Foundation Program. Section 16-13-231(b)(3)a. specifically provides:

"a. The funds available to meet the cost of the Foundation Program shall be appropriated by the Legislature taking into consideration an amount of local effort required on the part of each local board of education. The required local effort charged against each local board of education for its share of the cost of the Foundation Program shall be as follows:

"....

"3…. the equivalent of ten mills of local school tax district ad valorem tax as reported pursuant to subsection (b)(1)a."

Nothing in § 16-13-231 supports the conclusion that the local tax, in addition to the required 10 mill of ad valorem taxes, be considered a tax "collected for the purposes of participating in the Foundation Program."

In anticipation of the eventual formation of the Gulf Shores Board and school district, the Baldwin County Board sought an opinion of the attorney general on the precise issue presented here, i.e., whether any statutes or state laws required the proceeds of the local tax to be

distributed between the Baldwin County Board and the Gulf Shores

Board. The attorney general addressed the issue as follows:

"The plain language of local Act [No. 83-532, as amended by Act No. 84-523,] provides that 55 percent of the sales tax revenues shall be distributed to the Baldwin County Board of Education to be used for capital improvement, capital construction, and maintenance purposes. Nothing in the act provides that a portion of the sales tax revenues shall be distributed to municipal school systems in the county, and nothing in the act states that the tax is levied for 'public school purposes.'

"The language of Act [No. 83-532, as amended by Act No. 84-523,] should be contrasted with the language of section 40-12-4 of the Code of Alabama. Section 40-12-4 of the Code authorizes counties to collect 'franchise, excise and privilege license taxes with respect to privileges or receipts from privileges exercised in such county' to provide funds for 'public school purposes.' Ala. Code § 40-12-4 (2003). This section also provides that the county tax must parallel, except for the rate of the tax, the state sales tax. Id. The last sentence of this section states that '[i]n all counties having more than one local board of education, revenues collected under the provisions of this section shall be distributed within such county on the same basis of the total calculated costs for the Foundation Program for those local boards of education within the county.' Id. (emphasis added). Thus, any taxes collected for 'public school purposes' by a county under this section must be distributed among the local boards of education in the county on the same basis of the total calculated costs for the Foundation Program for those local boards of education.

"Article 2 of chapter 13 of title 16 generally provides for the apportionment and distribution of public school funds. Ala. Code § 16-13-30 to 16-13-40 (2001). Section 16-13-31 specifically discusses the apportionment of countywide taxes

for the Foundation Program. Section 16-13-31(c) states as follows:

"'The apportionment of countywide taxes collected for the purposes of participating in the Foundation Program as determined in Section 16-13-31(b) shall be used unless the local boards of education in a county sign a mutual agreement and secure the approval of the State Superintendent of Education to use some other plan involving desirable special adjustments.'

"Ala. Code § 16-13-31(c) (2001).

"The sales taxes collected in this situation, however, are collected pursuant to a local act and are not collected under section 40-12-4 for 'public school purposes.' Act [No.] 83-532 specifically states that the one percent sales tax provided by the act is in addition to all other taxes, including a special county privilege license tax paralleling the state sales tax. Accordingly, the requirement for distribution of sales taxes collected under section 40-12-4 to all the local boards of education in the county is not applicable to the taxes collected under [Act No. 83-532, as amended by Act No. 84-523]."

Ala. Att'y. Gen. Op. No. 2007-034 (Jan. 12, 2007). Both the local-tax act and § 40-12-4 were amended after the attorney general issued the opinion addressing the issue presented here. As discussed above, in 2017, significant changes were made to the local-tax act regarding the entities that receive appropriations under the local-tax act and the amount of those appropriations. Section 40-12-4 was amended in 2018 to provide that the terms "collection" and "administration," as used in § 40-12-4,

would have the same meaning as in § 11-3-11.3(i), Ala. Code 1975. See § 40-12-4(c). Neither amendment changed the relevant language of the local-tax act or § 40-12-4 and § 16-13-31(b) discussed and analyzed in the opinion of the attorney general, which concluded that the local-tax proceeds were not subject to allocation or distribution to the Gulf Shores Board. Although an attorney general's opinion is only advisory and not binding upon this Court, we find the legislative amendment of the local-tax act and § 40-12-4, without materially changing the relevant portions of the local-tax act and the other statutes discussed and relied upon in the attorney general's opinion, to be significant indication that the legislature approved of the attorney general's interpretation of the interplay between the local-tax act and § 40-12-4 and § 16-13-31(b). See Farmer v. Hypo Holdings, Inc., 675 So. 2d 387 (Ala. 1996) (holding that reenactment of a statute without material change from administrative interpretation is not binding on this Court but is especially persuasive).

We conclude that tax proceeds collected pursuant to the local-tax act may not be distributed to the Gulf Shores Board pursuant to § 40-12-4 and § 16-13-31(b). As the circuit court acknowledged, it is not within the province of the courts to rewrite the local-tax act in order to

redistribute to the Gulf Shores Board those tax proceeds collected pursuant to the local-tax act and earmarked for the Baldwin County Board. "In Alabama, legislation cannot originate with the judiciary." Ex parte Christopher, 145 So. 3d 60, 69 (Ala. 2013); see also Echols v. State, 24 Ala. App. 352, 353, 135 So. 410, 411 (1931) ("[C]ourts are without authority to add to or take from the written statutory law as passed by the Legislature and approved."). "[T]he judicial branch may not exercise the legislative ... power." Art. III, § 42(c), Ala. Const. 1901 (Off. Recomp.). Federal courts also follow the same principle. See Ali v. Federal Bureau of Prisons, 552 U.S. 214, 228 (2008); Badaracco v. Commissioner of Internal Revenue, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."); and Nguyen v. United States, 556 F.3d 1244, 1256 (11th Cir. 2009) ("We are not authorized to rewrite, revise, modify, or amend statutory language in the guise of interpreting it ...."). Accordingly, the Gulf Shores Board is not entitled to an order "allocat[ing to the Gulf Shores Board] the proceeds of all sales and use taxes raised for educational purposes within Baldwin County, Alabama, in accordance with Ala. Code §§ 40-12-4 and 16-13-31(b)."

In counts one through three of the complaint, the Gulf Shores Board also sought, in the alternative, a judgment declaring the local-tax act to be unconstitutional on the basis that it violates § 105 of the Alabama Constitution. The Gulf Shores Board asserted that, to the extent that the local-tax act requires distribution of tax proceeds earmarked for educational purposes differently than provided for in § 40-12-4, the local-tax act violated § 105, which prohibits a local law from being enacted on any subject that is already provided for by a general law. If, as the Gulf Shores Board requests, the local-tax act is declared unconstitutional as violative of § 105, then not only would the entities identified in the local-tax act as intended recipients of the local-tax proceeds not receive those tax proceeds, but also it would be impossible for the Gulf Shores Board to receive an appropriation of the local-tax proceeds. This Court has stated the following regarding standing to bring an action:

> "In determining whether a party has standing in Alabama courts, we are guided by whether the following exist: '(1) an actual, concrete and particularized "injury in fact" -- "an invasion of a legally protected interest"; (2) a "causal connection between the injury and the conduct complained of"; and (3) a likelihood that the injury will be "redressed by a favorable decision."' Alabama Alcoholic Beverage Control Bd. v. Henri-Duval Winery, L.L.C., 890 So. 2d 70, 74 (Ala. 2003) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))."

Ex parte Merrill, 264 So. 3d 855, 862-63 (Ala. 2018). The first two requirements of the standing inquiry are satisfied here. The Gulf Shores Board has asserted that it is entitled to an appropriation of the tax proceeds raised pursuant to the local-tax act and has not heretofore received an appropriation of those tax proceeds. However, we conclude that the third requirement -- likelihood that the injury will be redressed by a favorable decision -- is not satisfied here. The Gulf Shores Board has sought a judgment declaring that the local-tax act is unconstitutional. If the Gulf Shores Board was successful on that claim and the local-tax act was declared unconstitutional, it would be impossible for the alleged injury to be redressed by that decision because there would no longer be any tax proceeds generated by the local-tax act. See Ex parte Merrill, supra.

The plaintiffs contend that the local-tax act would not necessarily be invalidated if it was declared unconstitutional. The plaintiffs argue that the circuit court could declare the local-tax act unconstitutional in part, insofar as it relates to the allocation of local-tax proceeds to fund public education in Baldwin County, and then determine that the Baldwin County Commission has the authority to allocate a portion of

the local-tax proceeds pursuant to § 40-12-4. It appears, in other words, that the plaintiffs are contending that that component of the local-tax act could be severed from the act as a whole and the relevant portion of the local-tax proceeds could then be distributed under the provisions of § 40-12-4. That, however, would necessarily require the circuit court to rewrite the local-tax act, which, as discussed above, the courts are prohibited from doing. Accordingly, we conclude that the Gulf Shores Board lacks standing to bring its constitutional claim asserting that the local-tax act violates § 105 of the Alabama Constitution.

## II. Walker

Walker is a taxpayer and resides in Gulf Shores within the Gulf Shores school district. In count four of the complaint, Walker asserted an "equality-of-taxation" claim alleging that the local-tax act unconstitutionally imposes upon her and the residents of the Gulf Shores school district a tax whose proceeds are used completely outside the Gulf Shores school district and without providing any benefit to the citizens of the Gulf Shores school district. Walker sought in count four a judgment declaring the local-tax act unconstitutional.

The circuit court determined that Walker lacked standing to assert her constitutional claim, holding that the claim presented a nonjusticiable controversy because, it determined, the real matter in controversy was whether the Gulf Shores Board should receive an appropriation of a portion of the local-tax proceeds earmarked for the Baldwin County Board.

> "We have recognized that a justiciable controversy is one that is '"definite and concrete, touching the legal relations of the parties in adverse legal interest, and it must be a real and substantial controversy admitting of specific relief through a [judgment]."' MacKenzie v. First Alabama Bank, 598 So. 2d 1367, 1370 (Ala. 1992)(quoting Copeland v. Jefferson County, 284 Ala. 558, 561, 226 So. 2d 385, 387 (1969))."

Harper v. Brown, Stagner, Richardson, Inc., 873 So. 2d 220, 224 (Ala. 2003).

The plaintiffs argue that Walker is the master of her complaint and that the circuit court may not ignore the clear allegations contained in count four of the complaint and treat those allegations as what it determines the "real" matter in controversy to be. See Wright v. Cleburne Cnty. Hosp. Bd., Inc., 255 So. 3d 186, 192 (Ala. 2017) (stating that, "of course, it is the plaintiff who is 'the master of his complaint.' … It is for the court to address the merit of the claim as framed by the plaintiff, not

to reframe it."). Walker has alleged that she is a taxpayer living in the Gulf Shores school district and that she pays the tax levied pursuant to the local-tax act. Walker has further alleged that, although the local-tax act imposes a tax burden upon her and the other residents of the Gulf Shores school district, they receive no benefit from the local tax because the proceeds of the tax are apportioned to benefit public schools outside of, and to the exclusion of, the Gulf Shores school district. Walker sought a judgment declaring the local-tax act unconstitutional. Based on the foregoing, we conclude that a justiciable controversy does exist and that Walker has standing to assert her constitutional claim.

However, it is well settled that this Court may affirm a circuit court's judgment of dismissal "for any legal, valid reason, even one not raised in or considered by the circuit court, unless due-process fairness principles require that the ground have been raised below and it was not." State v. Epic Tech, LLC, [Ms. 1210012, May 20, 2022] __ So. 3d __, __ (Ala. 2022). The revenue commissioner and the county commissioners argued in their motion to dismiss that Walker's "equality-of-taxation claim" fails because it ignores the facts that the local-tax act does not levy solely a "school tax" and that a majority of the local-tax proceeds are

32

apportioned to fund other entities that benefit all the residents of Baldwin County, including Walker and the other residents who reside in the Gulf Shores school district.

The plaintiffs rely upon the decision in Garrett v. Colbert County Board of Education, 255 Ala. 86, 50 So. 2d 275 (1950), in support of Walker's constitutional claim. In Garrett, the legislature had enacted a local sales and use tax in Colbert County that paralleled the state sales and use tax. The local act allocated 75% of the tax proceeds to the Colbert County Board of Education ("the Colbert County Board") and the remaining 25% to the City of Tuscumbia Board of Education ("the Tuscumbia Board") and the City of Sheffield Board of Education ("the Sheffield Board"), to be split based on the percentage of population in each city. The local act provided that the tax proceeds allocated to the three boards of education were to be used exclusively for public-school purposes.

An action was brought challenging the local law and seeking to enjoin the custodian of public-school funds for Colbert County from collecting the tax levied under the local act. In the alternative, the action

sought to enjoin the Colbert County Board from receiving 75% of the tax proceeds. The circuit court denied the relief sought.

In affirming the judgment of the circuit court, this Court upheld the apportionment formula in the local act, finding that the allocation of the tax proceeds was purely a legislative matter that was not subject to review by this Court if the apportionment formula was based upon a reasonable foundation. Garrett, 255 Ala. at 94, 50 So. 2d at 281.  Further, it was argued on appeal that the local act violated  the principle -- which forms the basis of Walker's claim -- that prohibits the "levy of special taxes from the citizens of a definite locality to be expended in some other locality." Garrett, 255 Ala. at 94, 50 So. 2d at 281.  In upholding the local act, this Court stated:

> "In this connection, it is also insisted that the apportionment violates the principle which prevents the levy of special taxes from the citizens of a definite locality to be expended in some other locality. That principle was very carefully considered by the Supreme Court of Florida in the case of Amos v. Mathews, 99 Fla. 1, 23, 24, 26, 126 So. 308 [(1930)]. It is of universal application so far as we have been able to find. In 1 Cooley on Taxation (4th Ed.) section 314, with reference to a district tax it is said: 'The purpose to be accomplished thereby (the tax) shall be one which in a special and peculiar manner pertains to the district within which it is proposed that the contribution called for shall be collected.'

"We do not think that principle here serves to strike down Act No. 485 on account of the apportionment feature of it. The tax is a county wide one, having the county as the unit. It is not a tax on one district to be applied to another. It is paid by persons in the two cities and outside the two cities, all alike and for one fund. The question is one of apportionment rather than as above insisted on, although by exact measurement more of the tax may be paid in the cities than is apportioned to them. If the apportionment is not invalid, the other principle has no application here."

Garrett, 255 Ala. at 94-95, 50 So. 2d at 281-82.

Although the plaintiffs rely upon the principle stated in Garrett that prohibits the levy of special taxes on the citizens of a definite locality to be expended in some other locality, the holding in Garrett is actually supportive of the defendants' position and is dispositive of Walker's claim. Like the tax levied in Garrett, the local tax levied by the Baldwin County Commission pursuant to the local-tax act is a countywide tax that is apportioned on a countywide basis not only to the Baldwin County Board, but also to the Baldwin County Juvenile Court, the Baldwin County District Attorney's Office, CACC, and the Baldwin County general fund. Walker, and the other citizens residing in the Gulf Shores school district, undoubtedly benefit from the allocation of the local-tax proceeds to those other entities because those entities provide services on a countywide basis. Because the local-tax act levies a tax that is allocated

on a countywide basis to support services that are provided countywide, the principle set forth in <u>Garrett</u> that prohibits the levy of special taxes on the citizens of a definite locality to be expended in some other locality has not been violated, and Walker's constitutional claim therefore fails. Accordingly, the circuit court's order dismissing Walker's constitutional claim is due to be affirmed.

## Conclusion

We affirm the circuit court's judgment dismissing the plaintiffs' claims.

AFFIRMED.

Wise, Sellers, and Mendheim, JJ., concur.

Parker, C.J., and Mitchell, J., concur in part and concur in the result, with opinions.

Shaw, Bryan, and Stewart, JJ., concur in the result.

PARKER, Chief Justice (concurring in part and concurring in the result).

I agree with the main opinion except its omission to address Kelly Walker's claim that the local-tax act, §§ 45-2-244.071 - .077, Ala. Code 1975, violates § 105 of the Alabama Constitution. As Justice Mitchell points out in his special writing, this claim was asserted by both plaintiffs. And unlike the Gulf Shores City Board of Education, Walker had standing to raise this claim. Even though success on the claim would have resulted in invalidation of the local tax, Walker was allegedly harmed by paying the tax and presumably would have received redress through a refund, see Graves v. McDonough, 264 Ala. 407, 409, 88 So. 2d 371, 373 (1956), or at least relief from future collection of the tax. Further, Walker's § 105 claim must be addressed by this Court. Although Walker's equality-of-taxation claim fails for the reasons explained by the main opinion, nevertheless if her alternative § 105 claim were correct, the local-tax act would be invalid and the judgment would have to be reversed.

Regarding the merits of Walker's § 105 claim, that section of the constitution provides:

"No special, private, or local law, except a law fixing the time of holding courts, shall be enacted in any case which is

provided for by a general law, or when the relief sought can be given by any court of this state; and the courts, and not the legislature, shall judge as to whether the matter of said law is provided for by a general law, and as to whether the relief sought can be given by any court; nor shall the legislature indirectly enact any such special, private, or local law by the partial repeal of a general law."

Art. IV, § 105, Ala. Const. 1901 (Off. Recomp.). I fully agree with Justice Mitchell's analysis of this claim, with one exception and one caveat. First, I do not believe that the ordinary presumption of constitutionality applies to § 105 claims. Second, I join Justice Mitchell in commending some of the parties' use of contemporaneous dictionaries to aid this Court in the search for the original public meaning of § 105. But I also caution parties against relying solely on dictionaries. As Justice Mitchell and I have previously made clear, an originalist approach to interpreting § 105 must also draw from deeper wells. See Barnett v. Jones, 338 So. 3d 757, 766-67 (Ala. 2021) (Mitchell, J., concurring specially); Glass v. City of Montgomery, [Ms. 1200240, Feb. 11, 2022] ___ So. 3d ___, ___ n.3 (Ala. 2022) (Mitchell, J., concurring in part and concurring in the result); id. at ___ n.4 (Parker, C.J., dissenting). And those wells include the historical and legal context in which § 105 was adopted.

<u>I. Inapplicability of presumption of constitutionality</u>

Ordinarily, courts owe deference to the Legislature in the form of a presumption that statutes do not violate the constitution. This presumption does more than place the burden of persuasion on the party asserting unconstitutionality; it imposes a substantive duty on courts to hold a statute constitutional if reasonably possible, see Clay Cnty. Comm'n v. Clay Cnty. Animal Shelter, Inc., 283 So. 3d 1218, 1229 (Ala. 2019). In § 105, however, that duty "is forbidden to us by the constitution's express command." Glass v. City of Montgomery, [Ms. 1200240, Feb. 11, 2022] ___ So. 3d ___, ___ (Ala. 2022) (Parker, C.J., dissenting). Section 105 provides that "the courts, and not the legislature, shall judge as to whether the matter of [a special, private, or local] law is provided for by a general law." Art. IV, § 105, Ala. Const. 1901 (Off. Recomp.).

This language is unique within the Alabama constitution. It appears to have been a reaction to this Court's prior holding, under a predecessor of § 105, that the question whether the matter of a particular local law could have been provided for by a general law was "one of legislative discretion," Clarke v. Jack, 60 Ala. 271, 278 (1877). The people of Alabama rejected that deference in 1901, as this Court recognized

within seven years:

> "Prior to the adoption of the present Constitution this court held [in Clark] that it was the province of the Legislature to determine whether or not the 'cause' was provided for by a general law .... But this section (105) provides that the courts, and not the Legislature, shall judge as to whether the matter of said law is provided by a general law."

Forman v. Hair, 150 Ala. 589, 593-94, 43 So. 827, 829 (1907).

Notably, other states have similar constitutional provisions. For example, Minnesota's provides: "Whether a general law could have been made applicable in any case shall be judicially determined without regard to any legislative assertion on that subject." Art. XII, § 1, Minn. Const.; see also, e.g., Art. 4, § 40, subsec. 30, Mo. Const.; Art. 4, § 13, Ill. Const.; Art. 2, § 19, Alaska Const.

Here, excluding the presumption of constitutionality that Justice Mitchell applies, I still agree with the remainder of his explanation of why the local-tax act does not provide for the same subject matter as the general laws at issue. I simply add the observation that, in operation, tax laws are often sui generis in the sense that they contemplate unique sources and allocations of revenue. Thus, even when two tax laws raise revenue by similar means and for similar purposes, they may still provide

for different subject matters for purposes of § 105.

## II. A broad originalist approach to § 105

Some of the defendants in this case have focused on using contemporaneous dictionaries to understand the original meaning of § 105. Such dictionaries are a useful starting point, but they are by no means the ending point of originalist analysis. This is especially so when the provision in question uses broad language, words with a variety of potential meanings, or potential terms of art. For example, one cannot discover the original meaning of the federal Religion Clause by simply pulling out Samuel Johnson's and Noah Webster's dictionaries, looking up "free," "exercise," "establishment," and "religion," and collating those definitions. Likewise for the Second Amendment: Understanding the original meaning requires more than combining dictionary definitions of "keep," "bear," and "arms." Rather, genuine originalism frequently requires practitioners and scholars to look deeper into the historical and legal context in which a provision was adopted. See Barnett v. Jones, 338 So. 3d 757, 767 (Ala. 2021) (Mitchell, J., concurring specially); Glass v. City of Montgomery, [Ms. 1200240, Feb. 11, 2022] ___ So. 3d ___, ___ n.3 (Ala. 2022) (Mitchell, J., concurring in part and concurring in the result);

see, e.g., Town of Greece v. Galloway, 572 U.S. 565, 576 (2014); District of Columbia v. Heller, 554 U.S. 570, 584-603 (2008).

Thankfully, when it comes to § 105, a wealth of data about that context is presently available, including information about the historical impetus for American states' proscriptions of special laws, the 1901 constitutional convention's extensive debate regarding § 105, the similar language of earlier Alabama constitutions, other states' similar constitutional provisions adopted during the same period, and pre-1901 court decisions interpreting all those provisions.

Historically, constitutional prohibitions of special laws were rooted in a fundamental presupposition, derived from natural law, that civil government is divinely instituted to legislate for the common good, not for the individual benefit of private parties and groups. See Justin R. Long, State Constitutional Prohibitions on Special Laws, 60 Clev. St. L. Rev. 719, 725 (2012). James Madison observed that "a great proportion of the errors committed by the State legislatures proceeds from the disposition of the members to sacrifice the comprehensive and permanent interest of the State to the particular and separate views of the counties or districts in which they reside." The Federalist No. 46, at 296 (James

Madison) (Clinton Rossiter ed., 1961). Thus, state-constitutional prohibitions of special laws were developed in response to a 19th-century glut of special legislation that resulted from state legislatures' succumbing to special interests and ignoring the public welfare. See Harrisburg Sch. Dist. v. Zogby, 574 Pa. 121, 136, 828 A.2d 1079, 1088 (2003). See generally Robert M. Ireland, The Problem of Local, Private, and Special Legislation in the Nineteenth-Century United States, 46 Am. J. Legal Hist. 271 (2004).

Alabama's § 105 was no exception. At the 1901 constitutional convention, delegate (and former governor) Emmet O'Neal declared in his introduction of the provision that became § 105:

"Local, special or private bills are condemned because they destroy the harmony of the law, consume the time of the legislature, obscure in the eyes of members of the General Assembly the importance of general laws, furnish opportunity for perpetrating jobs,[2] inflict injustice on individuals or localities in the interest of a favored few. It has been truly declared that they are one of the scandals of the country. They have been in the past and will continue to be in the future the prolific sources of corruption. … The bribery and flagrant corruption which has disgraced the Legislature of some of the States of the Union can all be traced to the effort to secure the passage of local or private bills, conferring some special or

---

[2]At the time, one meaning of "job" was "a public duty or trust performed or conducted with a view to improper private gain." 4 The Century Dictionary 3235 (The Century Co. 1889).

valuable privilege, franchise or pecuniary advantage on the promoters or syndicate interested in the proposed legislation."

2 John Knox et al., Official Proceedings of the Constitutional Convention of the State of Alabama 1779-80 (Wetumpka Printing Co. 1940).[3]

Following O'Neal's introduction, the delegates extensively debated the proposed provision; the whole discussion extends almost 300 pages. See id. at 1774-2068. Many of their comments suggest a broad understanding of § 105. The overarching goal of the proponents was that "local or special legislation will be largely eliminated." Id. at 1785. One proponent explained that § 105 "started out with a view of stopping up every possible gap which the Legislature could get through on this question of local legislation." Id. at 1966. Section 105 was described as "let[ting] the courts and not the Legislature be the exclusive judge of whether the subject matter of local law could be reached by some general law in operation." Id. at 1932-33 (emphasis added). Under § 105, the question before the Legislature in deciding whether to pass a local or

_____

[3]On the date this opinion was released, this document was available online through the Alabama Department of Archives and History at the following Web address: https://digital.archives.alabama.gov/digital/collection/constitutions/id/120/.

special law would be "whether or not a matter before them was covered by a general law." Id. at 1940. The proponents likewise emphasized that "this provision is to prohibit [the Legislature] from passing any law of the same nature in regard to other subjects which are not mentioned [by § 104's list of prohibited subjects of special, private, or local laws] and which are provided for by the general law." Id. As an example of how § 105 would apply, a proponent explained that it would prevent the Legislature from passing a law granting emancipation to a specific minor, because a general law already defined the process whereby a minor could seek emancipation. Id. at 1967. Moreover, § 105 would operate by refusing "to delegate to the Legislature to determine whether or not a matter of local concern which was introduced before them had already been provided for by general law." Id. at 1966. One delegate explained:

> "Suppose, for instance, that a general law should be passed on any matter, why should any county or municipality be exempted from the operation of that law. …
>
> "It is not the working of the law, but it is the manner of creating the law that you desire to reach, and that you desire to make uniform throughout the state."

Id. at 1810.

On the other hand, a few statements in that debate have been read

by commentators as espousing a narrow view of § 105. For example, one proponent asserted:

> "[I]s there any hardship saying to any man, any individual, corporation or association that if the laws of the State have already provided for your case and you can get everything you could possibly get by appealing to the legislature, you ought not to consume the public time in trying to get the legislature to do what has already been done for you[?] That is all this provision means."

Id. at 1997. Some scholars have taken those statements to mean that the delegates understood § 105 to forbid a local law only "if there were an existing general law having precisely the same operation." James N. Walter, Jr., Local Legislation in Alabama: The Impact of Peddycoart v. City of Birmingham, 32 Ala. L. Rev. 167, 181 (1980); see J. Russell McElroy, No ... Local Law ... Shall Be Enacted in Any Case Which Is Provided for by a General Law, 7 Ala. Law. 243 (1946).

Of course, the goal of sound, textualist-type originalism is to understand and apply the original public meaning of the text, not the subjective intent of its framers. So the convention debate is relevant only to the extent that it sheds light on what the ratifying public understood the text to mean at the time.

As additional evidence regarding original meaning, it is significant

that § 105 was based on provisions in Alabama constitutions that had been adopted earlier in that period of constitutional reform. The 1865 constitution provided: "No special law shall be enacted for the benefit of individuals or corporations, in cases which are provided for by a general law, or where the relief sought can be given by any court of this State." Art. IV, § 38, Ala. Const. 1865. The 1875 constitution strengthened that prohibition: "No special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by a general law, or where the relief sought can be given by any court of this State ...." Art. IV, § 23, Ala. Const. 1875 (emphasis added).

We have recognized that the Alabama constitution should be interpreted in light of its predecessors. See Lockridge v. Adrian, 638 So. 2d 766, 768 (Ala. 1994); Moog v. Randolph, 77 Ala. 597, 606 (1884). In particular, when a constitutional provision was adopted after earlier similar provisions had been interpreted by our Court, those interpretations may provide evidence of the original public meaning of the provision in question. See State v. Sayre, 118 Ala. 1, 27-28, 24 So. 89, 92 (1897). And notably, in the years before § 105 was adopted, the 1875 provision was analyzed several times by our Court. See Clarke v. Jack,

60 Ala. 271, 278 (1877); <u>McKemie v. Gorman</u>, 68 Ala. 442, 448 (1880); <u>Jones v. Jones</u>, 95 Ala. 443, 449, 11 So. 11, 12 (1892); <u>Holt v. City of Birmingham</u>, 111 Ala. 369, 373, 19 So. 735, 736 (1896).

Further, most constitutional prohibitions of special or local laws by other states also originated in that same 19th- and early 20th-century period of reform. See 2 Shambie Singer, <u>Sutherland Statutes and Statutory Construction</u> § 40:1 (8th ed. 2022); Anthony Schutz, <u>State Constitutional Restrictions on Special Legislation as Structural Restraints</u>, 40 J. Legis. 39, 44-46 (2014). Indeed, the Alabama convention delegates who introduced § 105 expressly referenced other states' similar provisions and relied on their example as the "best considered constitutions." Knox et al., supra, at 1777-80. They also acknowledged that they drafted § 105 in the context of "numerous decisions of the courts of the States." <u>Id.</u> at 1799. Thus, those states' pre-1901 court decisions interpreting those provisions could be relevant to the original meaning of § 105. See, e.g., <u>State ex rel. Van Riper v. Parsons</u>, 40 N.J.L. 1 (Sup. Ct. 1878); <u>State v. Dalon</u>, 35 La. Ann. 1141 (1883); <u>Mathis v. Jones</u>, 84 Ga. 804, 11 S.E. 1018 (1890); <u>City of Louisville v. Kuntz</u>, 104 Ky. 584, 47 S.W. 592 (1898). And to the extent that those states' post-1901 decisions and

secondary literature have wrestled with the original meaning of their provisions, those efforts can benefit Alabama courts as well.

As we continue to seek the original meaning of § 105, I join Justice Mitchell in urging advocates and scholars to make use of contemporaneous dictionaries, but not to stop there. The goal is to interpret § 105 by seeking to understand "[w]hat was the most plausible meaning of the words of the Constitution to the society that adopted it." Antonin Scalia, Scalia Speaks 183 (Crown Forum 2017). Achieving that goal requires understanding the words in the context in which they were ratified. Thus, those who would help us uncover the original meaning of § 105 should research the history of anti-special-law provisions and carefully examine the debate at the 1901 convention for evidence of the public's understanding of the meaning and operation of § 105. In addition, they should review the language of earlier Alabama constitutions and of other states' pre-1901 constitutions, along with pre-1901 court decisions interpreting those constitutions. Any contemporaneous lay-audience advocacy, such as in newspaper articles or recorded stump speeches, should be examined. Further, the research should more broadly examine contemporaneous public usage of the

language in § 105 and in analogous provisions of our earlier constitutions, perhaps through corpus linguistics as Justice Mitchell cogently suggests. Analysis of all the available data will help ensure, to the extent possible, that we have a firm foundation for moving toward an approach that conforms to the original public meaning of the constitution.

MITCHELL, Justice (concurring in part and concurring in the result).

I agree that we should affirm the judgment of the Montgomery Circuit Court. Nothing in the text of §§ 16-13-31(b) or 40-12-4, Ala. Code 1975, requires a portion of the revenue collected from the Baldwin County tax imposed by § 45-2-244.071 et seq., Ala. Code 1975 ("the local-tax act"), to be distributed to the Gulf Shores City Board of Education ("the Gulf Shores Board"). But I believe the alternate argument made by the Gulf Shores Board and its co-plaintiff Kelly Walker ("the plaintiffs") -- that this tax violates § 105 of the Alabama Constitution -- is properly before our Court and must also be addressed.[4] As explained below, I ultimately find that argument to be without merit; therefore, I respectfully concur in part and concur in the result.

## This Court's § 105 framework

Section 105 generally prohibits the enactment of a "local law … in any <u>case</u> which is <u>provided for</u> by a general law." Ala. Const. 1901 (Off. Recomp.), Art. IV, § 105 (emphasis added). The provision further

---

[4]A majority of the Court concludes that the Gulf Shores Board lacks standing to bring its claim asserting that the local-tax act violates § 105 of the Alabama Constitution. Even if that is correct, as I read the plaintiffs' complaint, Walker has asserted that same claim and has standing to assert it.

provides that "the courts, and not the legislature, shall judge as to whether the <u>matter</u> of said law is provided for by a general law." <u>Id.</u> (emphasis added). Our caselaw considering § 105 has rightfully focused on the terms "case," "matter," and "provided for." In <u>Barnett v. Jones</u>, 338 So. 3d 757, 761 (Ala. 2021), we reviewed this caselaw and a plurality of this Court concluded that "the key to assessing a local law under § 105 is determining the subject covered by the general law or -- in the phrasing of the text of § 105 -- determining the 'case' or 'matter' 'provided for' by the general law." The <u>Barnett</u> Court further reiterated the general rule laid down in <u>Peddycoart v. City of Birmingham</u>, 354 So. 2d 808 (Ala. 1978), that "if the 'case' or 'matter' of the local law is 'provided for' by a general law -- that is, it covers 'matters of the same import' -- § 105 has been violated. But if not -- that is, if the laws cover things not of the same import -- the local law does not offend § 105." <u>Id.</u> at 762 (quoting § 105 and <u>Peddycoart</u>, 354 So. 2d at 811).[5]

_____

[5]In <u>Glass v. City of Montgomery</u>, [Ms. 1200240, Feb. 11, 2022] ___ So. 3d ___, ___ (Ala. 2022) (plurality opinion), a different configuration of Justices agreed "with the <u>Barnett</u> plurality's affirmation of <u>Peddycoart</u>'s 'same import' standard." By my count, between <u>Barnett</u> and <u>Glass</u>, a majority of the Justices on this Court have now indicated their agreement with this aspect of <u>Peddycoart</u>'s approach to § 105.

Analysis

Briefly summarized, the plaintiffs argue that the local-tax act violates § 105 in two ways. First, they contend that § 40-12-4(a) is a "general law" that "provide[s] for" a specific "case" -- the enactment of a countywide tax to raise funds for education. Therefore, they argue, the local-tax act, which they say addresses that same case (i.e., a countywide tax that raises funds for education) is unconstitutional. Second, they say that multiple statutes of statewide application -- including §§ 16-13-31(b) and 40-12-4(b) -- constitute general laws providing that the revenue raised from a countywide tax for education must be apportioned between the school systems in the county on a pro rata basis. Accordingly, they argue, the local-tax act is unconstitutional because it addresses that same matter, i.e., how the revenue raised from a countywide tax for education must be apportioned.

The defendants counter that the plaintiffs have defined the relevant case or matter too broadly, despite this Court cautioning parties not to do so.[6] See Barnett, 338 So. 3d at 763 (emphasizing "the

---

[6]The defendants include Eric Mackey, in his official capacity as Superintendent of the Alabama State Board of Education; Teddy J. Faust, Jr., in his official capacity as the Revenue Commissioner of

importance of not extending the boundaries of subject matter too broadly"); Drummond Co. v. Boswell, 346 So. 2d 955, 958 (Ala. 1977) (explaining that "[i]t is not the broad, overall subject matter which is looked to in determining whether the local act, taken together with the general law, is violative of § 105").  Thus, they argue, it is inappropriate to define the case provided for by § 40-12-4(a), or, alternatively, the matter of the local-tax act, as being simply countywide taxes that raise funds for education.  Rather, the defendants say, the case provided for by § 40-12-4(a) is a county's authority to levy "franchise, excise and privilege license taxes" that are to "be used exclusively for public school purposes."  In contrast, they argue, the matter provided for by the local-tax act is Baldwin County's authority "to levy … a special county privilege license tax paralleling the state sales tax."  While a portion of the funds raised

---

Baldwin County; James E. Ball, Joe Davis III, Billie Jo Underwood, and Charles F. Gruber, in their official capacities as Commissioners of Baldwin County; the Baldwin County Board of Education; Judge Carmen E. Bosch, in her official capacity as Presiding Judge of the Baldwin County Juvenile Court; Robert Wilters, in his official capacity as the Baldwin County District Attorney; and Coastal Alabama Community College.  These government officials and entities have collectively filed five appellee briefs.  Their arguments largely overlap, and some defendants have expressly adopted the arguments made by other defendants in their briefs.  For convenience, I have treated their arguments about § 105 as a collective argument.

by this tax are allocated to the Baldwin County Board of Education, some of the funds are allocated to other entities for noneducational uses, and some of the funds are even allocated to Baldwin County's general fund "to be expended as other county funds." Thus, the defendants argue, the case provided for by § 40-12-4(a) -- a county's authority to levy a franchise, excise, or privilege license tax to raise funds for public schools -- is different from the matter of the local-tax act -- Baldwin County's authority to levy a privilege license tax to raise funds generally.

Similarly, the defendants argue that §§ 16-13-31(b) and 40-12-4(b), and the local-tax act, cannot be reduced to laws addressing the broad case or matter of how revenue raised from a countywide tax should be allocated between local boards of education in a county. To be sure, § 16-13-31(b) provides for how countywide taxes collected for the purpose of participating in the Foundation Program, see generally § 16-13-230 et seq., Ala. Code 1975, should be allocated between the "local boards of education within the county," and § 40-12-4(b) provides that, in counties with multiple school systems, "revenues collected under the provisions of this section shall be distributed within such county on the same basis of the total calculated costs for the Foundation Program." But the

defendants emphasize that the revenue collected under the local-tax act is not collected either for purposes of participating in the Foundation Program or under the grant of authority made by § 40-12-4. Thus, they reason, the case provided for by those statutes is not the same as the matter addressed by the local-tax act. Or, in Peddycoart terms, the laws do not address "matters of the same import." 354 So. 2d at 811.

The defendants' argument is convincing. The plaintiffs' broad characterization of the legislative acts is not supported by the text of those acts. And defining the case provided for by a general law in broad terms that create a conflict with local laws is contrary to the fundamental principle that "'[w]e approach the question of the constitutionality of a legislative act "'"with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government."'"'" Bynum v. City of Oneonta, 175 So. 3d 63, 66 (Ala. 2015) (citations omitted). Consistent with our previous decisions, the case provided for by the relevant statutes and the matter provided for by the local-tax act can be narrowly defined to avoid running afoul of the § 105 prohibition. See, e.g., Barnett, 338 So. 3d at 762-63 (describing how this Court, in Town of Vance v. City of Tuscaloosa,

661 So. 2d 739 (Ala. 1995), and <u>Birmingham v. Vestavia Hills</u>, 654 So. 2d 532, 538 (Ala. 1995), "refused to treat the matter [provided for by the subject legislative acts] as annexation <u>generally</u>. Rather, it treated the matter provided for as annexation <u>in certain contexts</u>.").

Properly viewed, the case provided for by § 40-12-4 is not simply a county's authority to implement a countywide tax, or even a county's authority to implement a countywide tax that raises revenue for education. Rather, it is a county's authority to levy a franchise, excise, or privilege license tax to raise revenue <u>exclusively</u> for public-school purposes. The local-tax act, by contrast, provides for a different matter -- the authority of a county (Baldwin County) to levy a special privilege license tax to raise revenue for the county (the smaller part of which is allocated for educational purposes and the rest of which is used to support various other government purposes). Likewise, the case provided for by §§ 16-13-31(b) and 40-12-4(b) is not the allocation of tax revenue between school systems in a county "generally," it is the allocation of tax revenue between school systems in a county "in certain contexts." <u>Barnett</u>, 338 So. 3d at 762-63. The local-tax act, meanwhile, addresses such an allocation in a different context. When the case

provided for by the general laws is properly delineated in this way, it is apparent that the local-tax act does not run afoul of § 105.

The defendants, like the City of Montgomery in <u>Glass v. City of Montgomery</u>, [Ms. 1200240, Feb. 11, 2022] ___ So. 3d ___ (Ala. 2022), have provided this Court with "valuable supporting evidence" of the original public meaning of the terms "case" and "matter" that buttresses this understanding of § 105. ___ So. 3d at ___ (Mitchell, J., concurring in part and concurring in the result). Specifically, they point to the definitions of those terms found in dictionaries from the period when the Alabama Constitution was adopted. <u>See</u> <u>Barnett</u>, 338 So. 3d at 767 (Mitchell, J., concurring specially) ("When seeking to determine the original public meaning of a constitutional provision, it is necessary to examine relatively contemporaneous sources and older, pre-enactment sources that shed light on a provision's historical context."). Their discussion of the term "case" is particularly helpful.[7]

---

[7]In my special concurrence in <u>Barnett</u>, I encouraged parties "in future state-constitutional cases to provide appropriate research and arguments about the original public meaning of the provision they are asking us to interpret," noting specifically that "[w]hat the words 'case' or 'matter' were understood by the Alabama public to mean in 1901 would be of great interest to me in determining the scope of § 105." 338 So. 3d at 768-69 (Mitchell, J., concurring specially).

The relevant definitions of "case" in The Century Dictionary are "[a] particular determination of events or circumstances; a special state of things coming under a general description or rule" and "[a] state of things involving a question for discussion or decision." 1 The Century Dictionary 840 (The Century Co. 1889). And Webster's New International Dictionary defines case as "[a]n instance or circumstance of the kind; a special state of affairs; as, a case of injustice." Webster's New International Dictionary 339 (1910).[8] Notably, both of these contemporaneous dictionaries indicate that the term "case" carried with it an emphasis on the particular or special (as opposed to the broad and general) at the time the current Alabama Constitution was ratified. Courts should "give words the meaning they had at the time the law was adopted," Barnett, 338 So. 3d at 766 (Mitchell, J., concurring specially) (emphasis omitted), and these definitions indicate that the term "case"

---

[8]The defendants explain that they selected these two dictionaries because they were published in the period surrounding the ratification of the Alabama Constitution in 1901, and our courts have previously relied on them when determining the meaning of terms used in constitutional provisions and statutes. See, e.g., State v. Towery, 143 Ala. 48, 49, 39 So. 309, 309 (1905) (citing Webster's International Dictionary); Lovelady v. State, 15 Ala. App. 615, 618, 74 So. 734, 735-36 (1917) (citing The Century Dictionary).

would have been understood by the informed public at the beginning of the 20th century as referring to a set of particular circumstances, not a broad general category. This evidence further supports the defendants' argument about the original public meaning of § 105, a provision that has vexed this Court since it became law. See, e.g., Board of Revenue of Jefferson Cnty. v. Kayser, 205 Ala. 289, 290-91, 88 So. 19, 20-21 (1921) (discussing the meaning of § 105); see also Barnett, 338 So. 3d at 766 (Parker, C.J., concurring specially) (questioning whether this Court's current § 105 jurisprudence bears any resemblance to the original meaning of this constitutional provision).

Before ending, I would like to highlight an emerging research tool that courts are beginning to employ in cases presenting difficult issues of constitutional and statutory interpretation -- corpus linguistics. In short, corpus linguistics involves the use of an electronic database -- called a corpus -- that contains thousands or even millions of examples of everyday usage of a given word or phrase in a particular time period. By examining how a word had been used across a wide range of sources -- including not only academic works, but also sources in general public circulation (newspapers, periodicals, and works of fiction) -- corpus

1210353

linguistics can shed light on what the public would have understood a constitutional provision or statute to mean at the time it was ratified or enacted. See Thomas R. Lee & Stephen C. Mouritsen, Judging Ordinary Meaning, 127 Yale L.J. 788 (2018) (providing a broad overview of corpus linguistics). As one respected jurist has noted, corpus linguistics has the potential to be "a powerful tool for discerning how the public would have understood a statute's text at the time it was enacted." Wilson v. Safelite Grp., Inc., 930 F.3d 429, 440 (6th Cir. 2019) (Thapar, J., concurring in part and concurring in the judgment).

Courts at both the state and federal levels are now using corpus linguistics alongside other traditional research tools to help determine the meaning of disputed terms.[9] The Supreme Court of the United States

---

[9]See, e.g., United States v. Rice, 36 F.4th 578, 583 n.6 (4th Cir. 2022) ("[C]orpus linguistics supports the conclusion that the ordinary public meaning of strangulation at the time North Carolina passed § 14-32.4(b) involved intentional conduct."); United States v. Woodson, 960 F.3d 852, 855 (6th Cir. 2020) (applying corpus linguistics to a defendant's argument that the term "scheme" in a sentencing statute referred to a physical place as opposed to plans and actions); Health Freedom Defense Fund, Inc. v. Biden, [No. 8:21-cv-1693-KKM-AEP, Apr. 18, 2022] ___ F. Supp. 3d ___, ___ (M.D. Fla. 2022) (noting that a corpus-linguistics analysis of the term "sanitation" supported the conclusion that the term most frequently referred to "a positive act to make a thing or place clean"); Richards v. Cox, 450 P.3d 1074, 1078-81 (Utah 2019) (using corpus linguistics to determine what it means to enjoy "employment …

even discussed corpus linguistics during a recent oral argument in ZF Automotive US, Inc. v. Luxshare, Ltd., 596 U.S. ___, 142 S.Ct. 2078 (2022) (orally argued on March 23, 2022). And while that Court has not published a majority opinion containing a full-blown corpus-linguistics analysis, Justice Thomas has conducted searches using popular corpora, see Carpenter v. United States, 585 U.S. ___, ___ n.4 and accompanying text, 138 S.Ct. 2206, 2238 n.4 and accompanying text (2018) (Thomas, J., dissenting) (citing the Corpus of Historical American English, https://corpus.byu.edu/coha; and the Corpus of Founding Era American English, https://lawncl.byu.edu/cofea, and explaining that the phrase "expectation(s) of privacy" does not appear in "collections of early American English texts"), and Justice Alito has stated that "perhaps someday it will be possible to evaluate the[] canons [of interpretation] by

---

in the state's education systems" under Utah Const. Art. X, § 9); State v. Lantis, 165 Idaho 427, 433, 447 P.3d 875, 881 (2019) (noting that corpus linguistics supported the conclusion that a statute criminalizing disturbing the peace barred the disturbance of a "public, external peace" as opposed to a private, internal, or emotional peace); People v. Harris, 499 Mich. 332, 347, 885 N.W.2d 832, 838-39 (2016) (applying corpus-linguistics techniques to help determine whether a statute prohibiting "information" provided by a law-enforcement officer during an internal-affairs investigation from later being used against that officer in a criminal proceeding applied only to true information provided by the officer, or to both true and false information).

conducting what is called a corpus linguistics analysis, that is, an analysis of how particular combinations of words are used in a vast database of English prose." Facebook, Inc. v. Duguid, 592 U.S., ___, ___, 141 S.Ct. 1163, 1174 (2021) (Alito, J., concurring in the judgment) (citing Lee & Mouritsen, Judging Ordinary Meaning, 127 Yale L.J. 788 (2018)). Clearly, corpus linguistics is on the rise.

Convinced of the potential of this tool, some courts have even asked parties and amicus curiae to include corpus-linguistics analyses in supplemental briefs in pending cases. See, e.g., Jones v. Bonta, 34 F.4th 704, 714 n.6 (9th Cir. 2022) (noting that the court had "asked the parties to file supplemental briefing addressing in part the applicability of corpus linguistics to [the] case"); Wright v. Spaulding, 939 F.3d 695, 700 n.1 (6th Cir. 2019) ("We asked the parties to file supplemental briefs on the original meaning of Article III's case-or-controversy requirement, specifically whether the corpus of Founding-era American English helped illuminate that meaning."). While supplemental briefing is not necessary here, I echo those courts' general invitation and urge parties appearing before this Court in future state-constitutional and statutory cases to include corpus-linguistics analyses to help us wrestle with the original

public meaning of relevant provisions -- especially where key words or phrases are older and may have had a different meaning than they would have today.  Corpus linguistics will often serve only as a method to "check our work" and confirm the results of the underlying textual analysis, but "[i]n future cases where the ordinary meaning is debatable, … the results [of a corpus-linguistics analysis] could be determinative."  Wilson, 930 F.3d at 445 (Thapar, J., concurring in part and concurring in the judgment).